**Kelli SHANNON, Plaintiff,**

v.

**HOULTON BAND OF MALISEET INDIANS, et al., Defendants,**

No. Civ. 99–25–B.

United States District Court, D. Maine.

June 3, 1999.

**36**

Wayne P. Doane, Cuddy & Lanham, Bangor, ME, for plaintiff.

Gregory P. Dorr, Farrrell Rosenblatt & Russell, Bangor, ME, for defendant Maliseet Indians.

Michael A. Duddy, Kelly, Remmel & Zimmerman, Portland, ME, for defendant Clair Sabattis.

### ORDER AND MEMORANDUM OF DECISION

BRODY, District Judge.

Plaintiff Kelli Shannon ("Plaintiff") alleges that Defendants Houlton Band of Maliseet Indians ("the Band") and Clair Sabattis ("Sabattis"), former tribal chief of the Band, terminated her for having opposed unlawful practices they engaged in with respect to another employee. Plaintiff contends that in so doing, the Band violated 42 U.S.C. § 1983 (Count I), the Maine Human Rights Act, Me.Rev.Stat. Ann. tit. 5, §§ 4551–4632 (Count II), and the Maine Whistleblowers' Protection Act, Me.Rev.Stat.Ann. tit. 26, §§ 831–840 (Count IV), and breached her employment contract (Count III). She also asserts that Sabattis tortiously interfered with a contractual relationship (Count V). Before the Court is the Band's Motion to Dismiss for failure to state a claim and for lack of

jurisdiction, and Plaintiff's Motion to Amend the Amended Complaint. For the reasons discussed below, the Band's Motion to Dismiss is GRANTED, and Plaintiff's Motion to Amend the Amended Complaint is DENIED.

### I. BACKGROUND

When confronted with a Motion to Dismiss for failure to state a claim, the Court views all of Plaintiff's factual averments as true and indulges every reasonable inference in Plaintiff's favor. *See Aulson v. Blanchard,* 83 F.3d 1, 3 (1st Cir.1996). During the time period in question, Plaintiff was employed as the Band's Executive Director. In this capacity, she supervised Pamela Fillion ("Fillion"), the Band's Health Director. In the early fall of 1996, a dispute arose regarding an expense voucher submitted by Fillion. Sabattis, the Band's tribal chief at the time, instructed Plaintiff to fire Fillion on October 1, 1996, and Plaintiff did so. Fillion appealed her termination to the Tribal Council ("the Council").

At an internal hearing on the matter, Plaintiff told the Council that Sabattis had directed her not to contact Fillion about resolving the expense voucher disagreement. The Council then instructed Plaintiff to get a legal opinion as to Fillion's termination. Plaintiff obtained the requested legal opinion and after a general membership meeting at which Sabattis was not present, Fillion was rehired by the Band on November 24, 1996.

On November 26, 1996, Sabattis learned that Plaintiff had pursued a legal opinion and fired her, citing the fact that she had "jump[ed] the chain of command." The Band rehired Plaintiff almost immediately.

On January 27, 1997, both Plaintiff and Fillion were terminated again. Although Defendants told Plaintiff that they fired her for "having knowledge of and condoning [Fillion's] misappropriat[ion of] funds," Plaintiff claims that she was terminated

because she opposed Defendants' violations of Fillion's civil rights.[1]

Plaintiff filed a five-Count Complaint in this Court on January 27, 1999.[2] In Count I, the only federal cause of action asserted, she alleges that the Band "deprived [her] of her rights, privileges, and immunities guaranteed to her as a citizen of the United States" in violation of 42 U.S.C. § 1983 ("Section 1983"). (Pl.'s Am. Compl. ¶ 23.) Plaintiff also asserts that the Band's action violated the Maine Human Rights Act ("the MHRA"), Me.Rev.Stat.Ann. tit. 5, §§ 4551–4632 (Count II) and the Maine Whistleblowers' Protection Act ("the MWPA"), Me.Rev.Stat.Ann. tit. 26, §§ 831–840 (Count IV), and constituted a breach of an implied employment contract (Count III). In addition, Plaintiff claims that Sabattis is liable for tortious interference with a contractual relationship (Count V). She seeks back pay, front pay, compensatory damages, civil penal damages, attorney's fees, interest, and costs.

Plaintiff's original Complaint was amended to add and delete certain factual allegations. Neither defendant objected to this amendment. Soon after, the Band moved to dismiss Count I of the Amended Complaint for failure to state a claim and to dismiss the entire Amended Complaint for lack of jurisdiction.[3] Plaintiff objected to the Motion to Dismiss and simultaneously moved to file a Second Amended Complaint.

1. In a companion case, Fillion has filed suit against the Band and Sabattis as well.

2. Counts I–IV are against the Band only. Count V is against Sabattis only.

3. The Band bases this latter request on *Bell v. Hood*, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946), in which the Supreme Court acknowledged the possibility that "a suit may sometimes be dismissed for want of jurisdiction where the alleged claim under the Constitution or federal statutes clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous." *Bell*, 327 U.S. at 682, 66 S.Ct. 773.

## II. DISCUSSION

In its Motion to Dismiss, the Band argues that, for two reasons, Count I of Plaintiff's Amended Complaint fails to state a claim upon which relief may be granted: (i) Plaintiff has not alleged and cannot demonstrate either that her discharge was executed under color of state law or that the Band is a state actor, and (ii) Plaintiff has not alleged that the Band's conduct deprived her of rights protected by federal law or by the United States Constitution. In her Opposition to the Motion to Dismiss, Plaintiff offers a substantive challenge to the Band's first argument, but basically concedes the Band's second position: she has not, in her Amended Complaint, alleged a deprivation of rights secured by federal law or the United States Constitution. She proposes to remedy this defect through her Motion to Amend by adding causes of action under Title VII of the 1964 Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e, and under the Indian Civil Rights Act ("ICRA"), 25 U.S.C. §§ 1301–03. Under these circumstances, the Court considers it prudent and efficient to address the Motion to Amend before evaluating the Motion to Dismiss.

### A. Plaintiff's Motion to Amend

#### 1. Applicable Standard

Significant portions of the parties' briefs are devoted to contesting the appropriate standard to be applied in this case.[4]

4. Plaintiff argues that the Court should apply the familiar Federal Rule of Civil Procedure 15(a) "when justice so requires" standard to her Motion to Amend, and that the standard is satisfied in this case. She openly admits that her Motion is an attempt to survive the pending Motion to Dismiss, (Pl.'s Mot. Am. Comp. at 5–6, 8.), and claims that the amendments will not prejudice the Band since the new causes of action do not expand the underlying theory of the case and discovery has not yet commenced.

The Band, in contrast, noting that Plaintiff filed her Motion to Amend a little over two weeks after the deadline for amendments designated in the Scheduling Order had expired,

Ultimately, however, one standard that the Court must undisputedly apply here is dispositive: if a complaint as amended could not withstand a motion to dismiss, then the motion to amend should be denied as futile. *See Glassman v. Computervision Corp.*, 90 F.3d 617, 623 (1st Cir.1996) (motion to dismiss for failure to state claim); *Schock v. United States*, 21 F.Supp.2d 115, 124 (D.R.I.1998) (motion to dismiss for lack of jurisdiction). The Court concludes that each of Plaintiff's proposed amendments would be futile as a matter of law.

### 2. Title VII

■ The Band argues that Plaintiff's proposed Title VII claim is futile because (i) the Band, an Indian tribe, is exempted from coverage under Title VII, and (ii) Plaintiff failed to exhaust her administrative remedy with the Equal Employment Opportunity Commission and her claim is now time-barred.[5] Because the Court finds the first argument dispositive, it will not address the second.

Title VII explicitly exempts Indian tribes from its reach by excluding them from its definition of "employer." *See* 42 U.S.C. § 2000e(b) (1994). The applicability of the Title VII exemption to the Band is governed by the Maine Indian Claims Settlement Act ("the Federal Act"), 25 U.S.C. §§ 1721–35, and Maine's Act to Implement the Maine Indian Claims Settlement Act ("Implementing Act"), Me.Rev. Stat.Ann. tit. 30, §§ 6201–6214.[6] *See Akins v. Penobscot Nation*, 130 F.3d 482, 484–85 (1st Cir.1997) (outlining impact of Federal Act and Implementing Act on Indians in Maine as to both state and federal law). Section 1725(h) of the Federal Act states:

> Except as otherwise provided in this subchapter, the laws and regulations of the United States which are generally applicable to Indians ... shall be applicable in the State of Maine, except that no law or regulation of the United States (1) which accords or relates to a special status or right of or to any Indian ..., and also (2) which affects or preempts the civil, criminal, or regulatory jurisdiction of the State of Maine ..., shall apply within the State.

25 U.S.C. § 1725(h) (1994). The Court understands the plain language of this provision to indicate that an Indian tribe in Maine is subject to federal law generally applicable to Indians *unless* the particular law at issue both grants a special status to an Indian group *and* "affects or preempts" Maine law.[7] Against this statutory backdrop, the Band contends that the Title VII exemption applies in this case because, while the exemption clearly does grant a special status to Indians, it does not affect or preempt Maine law and therefore the second prong of the Section 1725(h) test is not satisfied. Plaintiff, in contrast, argues that this Court's decision in *Houlton Band of Maliseet Indians v. Maine Human Rights Comm'n*, 960 F.Supp. 449 (D.Me. 1997), dictates a conclusion that the Title VII exemption does not apply to the Band. As the parties largely are sparring over the import of *Houlton Band*, a review of that case is in order.

The controversy in *Houlton Band* was sparked by the Band's decision to terminate ten of its employees. *See Houlton Band*, 960 F.Supp. at 451. While the Band claimed that it took this action because the employees had violated a num-

contends that under these circumstances, the Court may grant the Motion to Amend only upon a showing of good cause. The Band takes the position that no such showing has been made here.

5. Sabattis joined in the Band's Response to Plaintiff's Motion to Amend.

6. In enacting the Federal Act, Congress ratified the Implementing Act, which memorial-ized a settlement agreement between the State of Maine and the Passamaquoddy Tribe, the Penobscot Nation, and the Band.

7. Neither party disputes that the Title VII exemption is a federal law generally applicable to Indians that grants a special status to Indians.

ber of internal policies, four of the former employees filed charges of race discrimination or retaliation under the MHRA with the Maine Human Rights Commission ("MHRC"). *See id.* The Band subsequently requested that the MHRC dismiss two of the complaints for lack of jurisdiction, and the MHRC denied this request, basing its decision on an Opinion by the Attorney General of the State of Maine which stated that the MHRC had jurisdiction over claims of employment discrimination against the Band. *See id.* The Band then filed a complaint in this Court seeking relief from the MHRC's denial of the Band's request for dismissal.[8] *See id.* The Court held that the Band is subject to Maine law and that the MHRC therefore had jurisdiction over employment discrimination claims against the Band. *See id.* at 453.

The Court's holding in *Houlton Band* was based on the plain language of the Federal Act and the Implementing Act. This language reflects that, unlike the Passamaquoddy Tribe and the Penobscot Nation, the Band is subject without exception to state law.[9] *See id.* at 452–53.

The terminated employees in *Houlton Band* did not bring suit under Title VII, and thus the Court was not faced in that case with the question of whether the Band could be liable under that statute. One of the Band's arguments in support of its position that the MHRC lacked jurisdiction over the state claims against it, however, was that "since Title VII … specifically states that Indian tribes are excluded from the definition of 'employer' … the Band may not be subject to civil suits based on alleged violations of Title VII or its state counterpart, the Maine Human Rights Act." *Houlton Band,* 960 F.Supp. at 455. The Court understood the gist of the Band's argument to be that the Title VII exemption of Indian tribes preempted the MHRA non-exemption of Indian tribes, and that therefore the Band was not subject to suit under either Title VII or the MHRA.

The Court rejected the Band's reasoning based on Section 1725(h). *See id.* at 455. Without engaging in traditional preemption analysis, the Court assumed that the Title VII exemption did preempt the MHRA non-exemption, and therefore concluded that Section 1725(h) barred the applicability of the Title VII exemption to the Band because under those circumstances, the Title VII exemption constituted a federal law that both granted a special status to an Indian group and preempted Maine law. *See id.* It even went so far as to declare that "[t]hus, the Title VII exemption of Indians from its definition of 'employer' does not apply to Indians residing in the State of Maine." *Id.*

This portion of *Houlton Band* admittedly is somewhat ambiguous. On the one hand, the Court rejected the Band's apparent contention that the Title VII exemption preempted the MHRA non-exemption. In the course of doing so, however, the Court simultaneously assumed that the Title VII exemption did in fact preempt the

---

**8.** The Band's complaint included three counts: (i) a claim that the MHRC decision violated its inherent sovereign and/or federally protected statutory right to adjudicate internal tribal matters (Count I); (ii) a claim that the MHRC decision and the Attorney General's Opinion violated the Band's Fourteenth Amendment right to equal protection under the law (Count II); and (iii) a claim that the MHRC decision and the Attorney General's Opinion deprived the Band of rights, privileges, and immunities secured by the United States Constitution and the laws of the United States in violation of 42 U.S.C. § 1983 (Count III).

**9.** The Court drew additional support from *Houlton Band of Maliseet Indians v. Boyce,* 688 A.2d 908 (Me.1997). In that case, the Maine Law Court observed that the Federal Act and the Implementing Act "make clear that members of the Band are subject to state laws" in the course of holding that the superior court properly exercised jurisdiction in ordering Band members to cease interfering with tribal business and in ordering the Band's bank to pay the Band's funds to the tribal council without liability. *See Boyce,* 688 A.2d at 911.

MHRA non-exemption. In other words, the presumed preemptive status of the Title VII exemption served as the basis for the Court's conclusion that the Title VII exemption did not preempt state law.

Later interpretation of this section of *Houlton Band,* however, resolves the issue at hand. In *Penobscot Nation v. Fellencer,* 164 F.3d 706, 711–12 (1st Cir.1999), *petition for cert. filed,* 67 U.S.L.W. 3654 (April 19, 1999) (No. 98–1690), the First Circuit clarified the proper reach of *Houlton Band*'s commentary on the applicability of the Title VII exemption. Before discussing the Court of Appeals opinion, however, some background on the district court decision will be helpful.

In *Fellencer,* this Court was faced with the question of whether the Penobscot Nation's firing of a community health nurse constituted an "internal tribal matter" within the meaning of the Implementing Act and the Federal Act and therefore whether the termination could be challenged under the MHRA in a Maine court. In the course of holding that the issue was not an "internal tribal matter," the Court rejected the Penobscot Nation's argument that Congress would not have exempted it from Title VII coverage while exposing it to similar state law claims. *See Fellencer,* 999 F.Supp. at 127. The Court stated that it had rejected this argument in *Houlton Band* and cited the following passage: "the Title VII exemption of Indians from its definition of 'employer' does not apply to Indians residing in the State of Maine." *Id.* at 127–28 (quoting *Houlton Band,* 960 F.Supp. at 455).

On appeal, the First Circuit reversed this Court's decision as to the "internal tribal matter" issue, and in so doing, placed great emphasis on the applicability of the Title VII exemption to the Penobscot Nation. *See Fellencer,* 164 F.3d at 711–12. The Court of Appeals made very

clear that the Title VII exemption applies to the Penobscot Nation. *Fellencer,* 164 F.3d at 712 ("we recognize[ ] that Congress 'explicitly made existing general federal Indian law applicable to the Penobscot Nation in the Settlement Act.' That body of law includes [the] Congressional enactment[ ] excluding Indian tribes from Title VII coverage …") (citations omitted) (quoting *Akins v. Penobscot Nation,* 130 F.3d 482, 489 (1st Cir.1997)). In a significant footnote ("Footnote 3"), the Court of Appeals also clarified the reach of *Houlton Band* concerning the Title VII exemption:

> The district court incorrectly expanded on the holding in [*Houlton Band*] in determining that the Penobscot Nation is not exempted from Title VII's coverage. The court in *Houlton Band* was opining on whether the Title VII exemption operated to preempt state law with respect to the Maliseet Indians, an outcome which clearly was not intended by the Settlement Act.

*Id.* at 711 n. 3.

This Court considers *Fellencer* dispositive as to the applicability of the Title VII exemption to the Band. First, Footnote 3 reflects the First Circuit's belief that the Title VII exemption does not preempt state law with respect to the Band. Therefore, the second prong of the Section 1725(h) test is not satisfied and the Title VII exemption applies to the Band. Second, the Court can discern no basis in the Implementing Act or in the Federal Act for distinguishing between the Penobscot Nation and the Band with respect to the applicability of *federal law.*[10] The one provision in the two Acts that purports to address the applicability of federal law, Section 1725(h), does not outline separate treatment for the Penobscot Nation, the Passamaquoddy Tribe, or the Band. If the First Circuit deems Section 1725(h) to render the Title VII exemption applicable to

10. There clearly are circumstances when the Band will be treated differently than the Penobscot Nation and the Passamaquoddy with respect to state law. *See* 25 U.S.C. § 1725(a), (b)(1), (d)(1), (d)(4)(C)(ii) (1994); Me.Rev.Stat. Ann. tit. 30, §§ 6202, 6204, 6206, 6206–A (1996).

the Penobscot Nation, as it has, *see id.* at 712, nothing in the statutes or in the relevant case law indicates that the Band should be treated differently.

Persuaded that the Title VII exemption, a law generally applicable to Indian tribes that grants a special status to Indian tribes, neither affects[11] nor preempts Maine law, the Court holds that the Title VII exemption applies to the Band and that therefore Plaintiff's Motion to Amend her Amended Complaint to add a cause of action under Title VII would be futile.

### 3. ICRA

Plaintiff claims that the Band's actions violated the ICRA, which provides that "[n]o Indian tribe in exercising powers of self-government shall ... deny to any person within its jurisdiction the equal protection of its laws or deprive any person of liberty or property without due process of law." 25 U.S.C. § 1302(8) (1994).

The Band argues that the proposed ICRA claim cannot stand because, under *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978), the only federal remedy authorized under the ICRA is habeas corpus relief. Anticipating the Band's reliance on *Santa Clara,* Plaintiff contends that her case falls into an arguable exception to *Santa Clara,* one articulated in the Tenth Circuit case *Dry Creek Lodge, Inc. v. Arapahoe and Shoshone Tribes,* 623 F.2d 682 (10th Cir.1980). The Court will examine both *Santa Clara* and *Dry Creek* in brief.

In *Santa Clara,* a female tribal member brought suit under the same ICRA provision invoked by Plaintiff in this case, alleging that a tribal membership ordinance violated equal protection principles. *See*

*Santa Clara,* 436 U.S. at 51, 98 S.Ct. 1670. The question presented in that case was whether the ICRA authorizes civil actions for declaratory or injunctive relief in federal courts to enforce its substantive provisions. *See id.* at 51–52, 98 S.Ct. 1670. The Supreme Court, convinced that Congress did not intend to limit Indian tribal sovereignty to the extent that Indian tribes could be forced to defend against such claims in a non-tribal forum, determined that the ICRA does not authorize such actions against a tribe or its officers. *See id.* at 60–72, 98 S.Ct. 1670. The one exception to this rule is Congress's express authorization of federal court jurisdiction over habeas corpus petitions. *See* 25 U.S.C. § 1303 (1983); *Santa Clara,* 436 U.S. at 66–67, 98 S.Ct. 1670. Significantly, the Court noted that this construction of the ICRA did not frustrate Congress's intent to extend constitutional norms to tribal self-government because tribal forums, including tribal courts and nonjudicial tribal institutions, may be appropriate bodies for adjudication of ICRA claims. *See id.* at 65, 98 S.Ct. 1670.

*Santa Clara* was not limited to its facts. *See Ordinance 59 Ass'n v. United States Dep't of the Interior Secretary,* 163 F.3d 1150, 1157 (10th Cir.1998); *R.J. Williams Co. v. Fort Belknap Hous. Auth.,* 509 F.Supp. 933, 941 (D.Mont.1981). In light of this, it appears that, with the exception of habeas corpus relief, federal courts will not have jurisdiction over ICRA claims "unless and until Congress makes clear its intention to permit the additional intrusion on tribal sovereignty that adjudication of such actions in a federal forum would represent." *Santa Clara,* 436 U.S. at 72, 98 S.Ct. 1670. Two years after *Santa Clara* was decided however, the Tenth Circuit

11. Section 1725(h) also allows for the possibility that a federal law granting a special status to Indians may not apply to Indians in the State of Maine because it "affect[s]" state law. The Court readily concludes that the Title VII exemption does not affect state law. As discussed in *Houlton Band,* while courts may look to federal law for guidance in evaluating state discrimination claims, they do not change the substantive law of the state where it differs from analogous federal law. *See Houlton Band,* 960 F.Supp. at 449. Thus, the Title VII exemption may coexist with the MHRA non-exemption without "affecting" courts' applications of the MHRA's substantive provisions.

fashioned an exception to the Supreme Court's broad rule. *Dry Creek* involved a non-Indian plaintiff, Dry Creek Lodge, Inc., that owned land located on the defendant tribes' reservation. *See Dry Creek,* 623 F.2d at 682–83. Dry Creek sought permission from the reservation's superintendent to develop the land and permission was granted. *See id.* at 684. The access road leading to the lodge, however, crossed over land owned by an Indian family. *See id.* The day after the lodge the plaintiff had built opened, the defendant tribes blocked the access road at the request of the Indian family. *See id.*

Dry Creek asked the tribal court to hear the dispute, but the tribal court declined to take the case absent consent of the Business Council, and the Business Council did not consent. *See id.* Dry Creek brought suit under the ICRA in state court, and the case was removed to federal court, where the defendant tribes' motion to dismiss for lack of jurisdiction was granted. *See id.* at 683. The Tenth Circuit reversed the dismissal and remanded for trial. *See id.* At trial, the jury issued a verdict for the defendant tribes, but the district court granted a motion for a new trial on damages only. *See id.* Before retrial, *Santa Clara* came down, and the district court dismissed the ICRA claim against the defendant tribes for lack of jurisdiction based on that case. *See id.*

On appeal, the Tenth Circuit reversed the district court. The Court distinguished *Santa Clara,* reasoning that "the reason for [*Santa Clara*'s] limitations … disappears [where a tribal forum for adjudication of ICRA claims is not available and] when the issue relates to a matter outside of internal tribal affairs and when it concerns an issue with a non-Indian." *Dry Creek,* 623 F.2d at 685. Of paramount importance to the Court was Dry Creek's lack of access to a forum: "There has to be a forum where the dispute can be settled.... To hold that they have access to

no court is to hold that they have constitutional rights but no remedy." *Id.* In a strong dissent, Judge Holloway argued that the "broad terms" of *Santa Clara* dictated a contrary result. *See id.* at 685–86.

The Tenth Circuit has distanced itself from *Dry Creek* in recent years. *See Ordinance 59 Ass'n v. U.S. Dept. of Interior Secretary,* 163 F.3d 1150, 1158–59 (10th Cir.1998) ("[W]e emphasize the minimal precedential value of Dry Creek. With the exception of Dry Creek itself, we have never found federal jurisdiction based on the Dry Creek exception."). Today, in that Circuit, in order to benefit from the "Dry Creek exception," a plaintiff must show that (i) the dispute involves a non-Indian party, (ii) a tribal forum for adjudication of ICRA claims is not available, and (iii) the dispute involves an issue falling outside internal tribal affairs.[12] *See id.* at 1156. The Tenth Circuit has also reiterated that "Santa Clara was not fact-specific .... [but rather] a broad holding" and that "the Dry Creek exception is to be interpreted narrowly." *Id.* at 1157.

Plaintiff urges the Court to apply the *Dry Creek* exception in her case, and offers the following argument:

> This case does not involve basic tenets of how tribal life will exist in the future. Nor does it involve an intertribal dispute between [I]ndians. Finally, in the case at bar, the Defendant HMBI offers no remedy to Shannon for the resolution of this claim. The Maliseet have no tribal court and have failed to gain access to the two existing courts within Maine to create such an avenue for adjudicating ICRA claims.

(Pl.'s Mot. Amend Am. Compl. at 10.) The Court observes that adoption of the so-called "Dry Creek exception" to *Santa Clara* is a question of first impression in the First Circuit. Despite this, both parties proceeded directly to the issue of

---

**12.** The Tenth Circuit additionally clarified that this three-prong test may not be dis-

placed by a more nebulous "absolute necessity" standard. *See id.* at 1157–59.

whether Plaintiff has satisfied the three-part *Dry Creek* test. Even assuming, however, that the First Circuit would adopt the *Dry Creek* exception to *Santa Clara*,[13] Plaintiff's claim would fail because she does not satisfy at least two of the three *Dry Creek* criteria. First, in its Response to the Motion to Amend, the Band asserts that Plaintiff is, in fact, a tribal member, and Plaintiff neither responds to nor rebuts this claim in her Reply. The Court therefore can only conclude that this is not a controversy implicating a non-tribal member.

Second, Plaintiff does not dispute that a tribal forum for her ICRA claim was available to her via a grievance procedure outlined in the Personnel Department's Policy and Procedure Manual.[14] Rather, she argues that it is ludicrous to expect her to "go back before the very people who have just retaliated against her and ask that they find their leader has acted inappropriately" because doing so would be futile. (Pl.'s Reply Mot. Amend Am. Compl. at 8–9). While Plaintiff accurately cites two cases, *Bowen v. City of New York*, 476 U.S. 467, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986), and *NLRB v. Industrial Union of Marine and Shipbuilding Workers of America, AFL–CIO, Local 22*, 391 U.S. 418, 88 S.Ct. 1717, 20 L.Ed.2d 706 (1968), for the proposition that exhaustion requirements may be waived where exhaustion would be futile, these cases are inapposite here. In order to assert the *Dry Creek* exception, a plaintiff "must have actually sought a tribal remedy, not merely have alleged its futility." *White v. Pueblo of San Juan*, 728 F.2d 1307, 1312 (10th Cir.1984) ("This is not merely a requirement that the exhaustion of tribal reme-

dies is a prerequisite to federal jurisdiction, but instead, that tribal remedies, if existent, are exclusive."); *see also Olguin v. Lucero*, 87 F.3d 401, 404 (10th Cir.1996); *Jimi Dev. Corp. v. Ute Mountain Ute Indian Tribe*, 930 F.Supp. 493, 497 (D.Colo.1996). Plaintiff does not claim to have made any attempt to utilize the undisputedly available forum.

In sum, this Court lacks jurisdiction over Plaintiff's proposed ICRA claim and therefore Plaintiff's Motion to add this claim is futile.

### 4. Conclusion

As the Court has determined that Plaintiff's proposed Title VII and ICRA claims would not survive a Motion to Dismiss, Plaintiff's Motion to Amend the Amended Complaint is denied.

### C. The Band's Motion to Dismiss

### 1. Count I

■ The Court may grant a defendant's Motion to Dismiss for failure to state a claim "only if it clearly appears, according to the facts alleged, that the plaintiff cannot recover on any viable theory." *Correa–Martinez v. Arrillaga–Belendez*, 903 F.2d 49, 52 (1st Cir.1990). As discussed above, the Band argues, and Plaintiff concedes, that Count I fails to state a claim upon which relief may be granted because she has not alleged that the Band's conduct deprived her of rights protected by federal law or by the United States Constitution. Plaintiff's attempt to cure this admitted deficiency was unsuccessful. As a plaintiff may only recover under Section 1983 where an independent source of fed-

---

13. In a recent case, the First Circuit appeared to acknowledge *Dry Creek*'s concern that aggrieved individuals have access to a forum for adjudication of their ICRA claims. *See Akins v. Penobscot Nation*, 130 F.3d 482, 486 & n. 6 ("This is not a potential instance of a right without a remedy.... The Penobscot Nation concedes ... that Akins's claims ... may by brought under the [ICRA] ... in the Penobscot Nation Tribal Court.").

14. Plaintiff seems to suggest that a tribal court is the only appropriate forum for adjudication of an ICRA claim. *Santa Clara* belies this proposition. *See Santa Clara*, 436 U.S. at 65–66, 98 S.Ct. 1670 ("Nonjudicial tribal institutions have also been recognized as competent law-abiding bodies.")

**44**

eral or constitutional rights is implicated, the Court agrees with the Band that Count I of Plaintiff's Amended Complaint fails to state a claim and therefore dismisses that claim.[15]

### 2. Counts II–V

Plaintiff's remaining claims are grounded in state law. Because the Court has dismissed the one claim over which it had original jurisdiction, the Court dismisses these supplemental state law claims pursuant to 28 U.S.C. § 1367(c)(3). *See Astrowsky v. First Portland Mortgage Corp., Inc.,* 887 F.Supp. 332, 337 (D.Me.1995). These issues are more appropriately resolved in state court.

### III. CONCLUSION

For the reasons discussed above, Plaintiff's Motion to Amend the Amended Complaint is DENIED, and the Band's Motion to Dismiss Count I of the Amended Complaint is GRANTED.

*SO ORDERED.*

---

**15.** Given that the Band's Motion to Dismiss is resolved on this basis, the Court need not address the Band's alternative argument that it is not a state actor for purposes of Section 1983 analysis. The Court also declines the Band's invitation to view Plaintiff's deficient Section 1983 claim as so "wholly insubstantial and frivolous" as to justify a dismissal of the entire Amended Complaint for lack of jurisdiction under *Bell v. Hood,* 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946).