Governor Lincoln C. ALMOND,
et al., Plaintiffs, Appellees,

v.

CAPITAL PROPERTIES, INC., and
Metropark, Ltd., Defendants,
Appellants.

No. 99–2249.

United States Court of Appeals,
First Circuit.

Heard April 6, 2000.

Decided May 8, 2000.

Gerald J. Petros with whom Christopher R. Bush, Charles D. Blackman and Hinckley, Allen & Snyder LLP were on brief for appellants.

Joseph S. Larisa, Jr. with whom Claire Richards, Executive Counsel to the Governor, was on brief for appellees.

Before BOUDIN, STAHL and LIPEZ, Circuit Judges.

BOUDIN, Circuit Judge.

Defendant-appellant Capital Properties, Inc., owns a garage at the railroad station in Providence, Rhode Island. The garage exists because in 1982 various parties, including the Federal Railroad Administration ("FRA"), the State of Rhode Island, and Capital Properties' predecessor-in-interest entered into an extensive "cooperative agreement" to relocate the station; and, as part of the agreement, the FRA agreed to pay 50 percent of the cost of a new garage.

FRA and Capital Properties' predecessor-in-interest also entered into a subordinate agreement concerning the operation of the new garage parking facility. A crucial paragraph of this "parking agreement" provided as follows in paragraph 6(b):

> Except as provided in subsection (c) below, FRA or its designee shall have the right of prior approval of any changes in public parking rates. Any request by P & W [Capital Properties' predecessor-in-interest] for such a change shall be accompanied by appro-

priate justification. FRA or its designee shall not unreasonably withhold approval of such a request if the interests of intercity rail passengers are not adversely affected by the requested change.

Subsection (c) permitted the garage operator to increase rates for parking for a period of less than nine hours, decrease rates for a parking period of nine hours or more, and regularly increase all parking rates in equal proportion by a percentage keyed to the percentage increase in the Consumer Price Index since the last rate increase.

Although the state was not a signatory to the parking agreement, it was a party to the cooperative agreement, a provision of which contained a promise by Capital Properties' predecessor "to comply fully with the terms of [the parking agreement] attached to and made a part of this" cooperative agreement. This incorporation clause also permitted the FRA and the garage operator to amend the parking agreement by themselves, subject to review and comment by any other affected party; but there is no indication that paragraphs 6(b) and (c) have since been amended.

When the garage opened in 1988, rates for all rail passengers were apparently set below market rates. Monthly passes for Providence/Boston commuters were originally sold at a discounted monthly rate of $40 but rose over time to $80 per month. In late September 1999, Capital Properties announced that it was eliminating the monthly discount for commuters, effectively raising the rate to approximately $200 per month. Capital Properties did not seek the FRA's permission before instituting the rate increase and apparently has never claimed that the increase could be justified as a CPI adjustment under subsection (c).

Rhode Island Governor Lincoln Almond and the Rhode Island Department of Transportation (collectively, "the state"), then began this action in state court to

enjoin Capital Properties' alleged violation of its contractual obligation to seek FRA approval for rate increases, and Capital Properties removed the case to federal court. The state sought temporary relief and, after a hearing on October 4, 1999, the district court determined to enjoin the increase on the ground that Capital Properties had failed to seek the FRA's approval (a TRO was issued on October 22). After the hearing, Capital Properties submitted a request to the FRA seeking approval of the increase, the state objected to the request, and, while the matter was pending before the FRA, the district court held a further hearing on October 26, 1999, and ordered from the bench:

> I will grant the request for a preliminary injunction that precludes Capital Properties from raising the parking rates unless and until it obtains the approval of the FRA or alternatively unless and until it establishes that the FRA has unreasonably refused to give approval or has failed to rule on the request within a reasonable period of time.

Three days later, on October 29, 1999, the FRA in a letter denied Capital Properties' request. The letter said that granting the request would inflict large rate increases on passengers commuting between Providence and Boston, that passengers in this category were regarded by the FRA as among those whom the parking agreement was importantly designed to protect, and that the large increase had not been adequately justified. The letter said that the FRA was willing to consider justified increases and suggested that the matter be resolved through negotiations rather than through litigation.[1]

In the meantime, in the district court, Capital Properties filed a motion on October 28, 1999, requesting that the state provide security for the preliminary in-junction. The state objected, saying that the motion for security was "moot because the conditions of the injunction ... have already been satisfied." On November 2, 1999, the state submitted a formal proposed injunction, based on the district court's earlier above-quoted oral ruling, to enjoin Capital Properties from raising rates "until and unless approval is received from the [FRA]" or until further order of the court. The district court issued this order on November 5, 1999, but has not yet ruled on the security request.

Capital Properties now seeks review of the preliminary injunction, as it is entitled to do. 28 U.S.C. § 1292(a)(1) (1994). Its most salient claims are that the state lacks standing to seek a preliminary injunction, that the injunction was improvidently granted, and that a bond should have been required. Before turning to these issues, we have to address an issue that neither party has raised—the federal courts' subject matter jurisdiction over this suit. *American Airlines, Inc. v. Cardoza–Rodriguez,* 133 F.3d 111, 115 n. 1 (1st Cir. 1998).

■ This action was removed from state court on the ground that it came within the district court's "arising under" jurisdiction, 28 U.S.C. § 1331 (1994). This appears to be a correct position, as we will explain, because the complaint necessarily presents and turns upon the interpretation of a contractual obligation to the United States. But this is a remarkably tangled corner of the law and there is little direct authority, partly because in most cases interpreting contracts with the United States the federal government is a party and jurisdiction is automatic under 28 U.S.C. §§ 1345, 1346(a)(2) (1994).

■ Although Article III's grant of "arising under" jurisdiction is broad, section 1331 itself (despite its use of almost

---

1. On November 24, 1999, Capital Properties brought suit against the FRA in the United States Court of Claims. *Capital Properties, Inc. v. FRA,* No. 99–954C (Ct.Cl.). Apparent-ly, the suit seeks damages on the ground that the FRA was obligated to permit the rate increase sought.

identical language) has been read more narrowly. *See* ALI, *Study of the Division of Jurisdiction Between State and Federal Courts* 179 (1969). Undoubtedly, section 1331 covers claims that are *created* by federal law (including federal common law), whether expressly or by implication. *E.g., Franchise Tax Bd. v. Construction Laborers Vacation Trust,* 463 U.S. 1, 8–9, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983) (section 1331 applies where federal law creates the cause of action); *National Farmers Union Ins. Companies v. Crow Tribe of Indians,* 471 U.S. 845, 850, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985) (federal common law is law of United States for purposes of section 1331).

But it is simply unclear under the case law whether the state's contract claim here could properly be viewed as "created" by federal common law where the plaintiff and the defendant are both private parties. *Miree v. DeKalb County,* 433 U.S. 25, 30–31, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977), may suggest that the answer is no, but its message is not crystal clear. *Cf. Price v. Pierce,* 823 F.2d 1114, 1119–20 (7th Cir. 1987) (distinguishing *Miree* ), *cert. denied,* 485 U.S. 960, 108 S.Ct. 1222, 99 L.Ed.2d 422 (1988). We will assume, *arguendo* and without deciding the point, that federal law does not "create" the state's contract claim in this case even though (as we will see) federal law surely controls on what is the most important issue.

A more controversial basis for "arising under" jurisdiction under section 1331 exists where, regardless of whether federal or state law creates the claim, a well-pleaded complaint necessarily "requires resolution of a substantial question of federal law." *Franchise Tax Bd.,* 463 U.S. at 13, 103 S.Ct. 2841. The Supreme Court has periodically affirmed this basis for jurisdiction in the abstract (*Smith v. Kansas City Title & Trust Co.,* 255 U.S. 180, 41 S.Ct. 243, 65 L.Ed. 577 (1921), is the most famous example), occasionally cast doubt upon it, rarely applied it in practice, and left the very scope of the concept unclear.[2] Perhaps the best one can say is that this basis endures in principle but should be applied with caution and various qualifications. ALI, *supra,* at 178–79.

The central issue properly presented by the well-pleaded complaint in this case is whether Capital Properties' promise to the FRA includes an obligation to obtain the FRA's approval before implementing the increase in parking charges at issue in this case. The Supreme Court has repeatedly said that "obligations to and rights of the United States under its contracts are governed exclusively by federal law." *Boyle v. United Techs. Corp.,* 487 U.S. 500, 504, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). It seems to us to defy common sense that the answer to the question *whether* paragraph 6 obliges the garage to get FRA approval should turn on federal law if the FRA is party to the suit but on state law if the FRA is not a party. *Cf. id.* at 507, 108 S.Ct. 2510 (applying federal common law to suit between private parties where imposition of liability could "directly affect the terms of government contracts").

What remains is the almost unanswerable question of whether the Supreme Court would regard the federal issue in this case as sufficiently important to confer

---

2. *See,* in addition to *Smith* and *Franchise Tax, City of Chicago v. International College of Surgeons,* 522 U.S. 156, 164, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997); *Merrell Dow Pharmaceuticals Inc. v. Thompson,* 478 U.S. 804, 808–09 & n. 5, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986); *Moore v. Chesapeake & O. Ry. Co.,* 291 U.S. 205, 54 S.Ct. 402, 78 L.Ed. 755 (1934); *see also PCS 2000 LP v. Romulus Telecommunications, Inc.,* 148 F.3d 32, 35 (1st Cir.1998); *American Policyholders Ins. Co. v. Nyacol Prods., Inc.,* 989 F.2d 1256, 1261–64 (1st Cir. 1993), *cert. denied,* 510 U.S. 1040, 114 S.Ct. 682, 126 L.Ed.2d 650 (1994); *Long v. Bando Mfg. of America, Inc.,* 201 F.3d 754, 759–61 (6th Cir.2000); *Frank v. Bear Stearns & Co.,* 128 F.3d 919, 922 (5th Cir.1997); *Republic of Philippines v. Marcos,* 806 F.2d 344, 354 (2d Cir.1986), *cert. denied,* 481 U.S. 1048, 107 S.Ct. 2178, 95 L.Ed.2d 835 (1987); *T.B. Harms Co. v. Eliscu,* 339 F.2d 823, 827–28 (2d Cir.1964) (Friendly, J.), *cert. denied,* 381 U.S. 915, 85 S.Ct. 1534, 14 L.Ed.2d 435 (1965).

"arising under" jurisdiction on the district court under section 1331 where the claim (we are assuming *arguendo* ) is for a state remedy. Two of the Supreme Court decisions (*Smith* and *City of Chicago* ) have said yes where important constitutional issues were presented; two have said no where a state tort claim merely incorporated a federal fault standard (*Merrell Dow* and *Moore* ). Our case arguably falls in the middle: the federal interest is less than in *Smith* (*City of Chicago* is hard to classify) but surely more than in *Merrell* and *Moore.*[3]

The ALI Study described existing doctrine on this issue as "neither analytical nor entirely logical." ALI, *supra,* at 179. About the closest case in point that we can find involved a dispute between private parties turning on the interpretation of a contract provision approved by a federal agency pursuant to a federal statutory scheme; there, Chief Judge Posner concluded that the critical issue was governed by federal law *and* sufficed to confer subject matter jurisdiction under section 1331. *Price v. Pierce,* 823 F.2d 1114, 1119–20 (7th Cir.1987), *cert. denied,* 485 U.S. 960, 108 S.Ct. 1222, 99 L.Ed.2d 422 (1988). We are content to follow *Price* pending further enlightenment from the Supreme Court.

We turn next to standing. Although the agreement to submit parking rate increases to the FRA appears only in a contract between the FRA and Capital Properties' predecessor, the cooperative agreement incorporated the parking agreement as a commitment not only to the FRA, but also to the named parties .to the cooperative agreement, among whom is the state.

Thus, on the face of the matter, it appears that Capital Properties is obligated to the state (directly and not merely as a third-party beneficiary) to seek prior approval from the FRA for increases in garage rates.

■ A party to a contract ordinarily has "standing" to seek enforcement of a contractual promise made to it . by another party. Surely, if Capital Properties had made a bilateral contract with the state promising, in exchange for a subsidy, not to raise parking rates without FRA permission, the state would have a sufficient stake in the enforcement of its own contract to bring this suit, even though the immediate injury from a violation would be suffered by the commuters. *Cf. Restatement (Second) of Contracts* § 305(1) (1981) (promisor may have duty both to promisee and to separate beneficiary).[4] Reading the cooperative and parking agreements together, this is virtually the present case.

■ Capital Properties says that in any event the district court erred on the merits in granting the preliminary injunction. Capital Properties' main argument appears to be that the parking agreement was designed only to protect "intercity rail passengers," that the phrase "intercity rail passengers" excludes "commuters," even if they travel between cities in their commute, and that "intercity rail passengers" are not affected by the rate increases here. It is unclear whether Capital Properties thinks that therefore it need not go to the FRA to request approval or whether it thinks that the FRA must approve the rate increases automatically.

---

**3.** In *Merrell* and *Moore,* there was certainly some federal interest in proper application of a federal standard intended to govern private conduct; but in the present case, the federal interest is far more manifest because not only is a federal agency a party to the contract, but the issue presented is whether a specific rate increase must be presented to that agency.

**4.** *Cf. Adams v. Union R. Co.*, 21 R.I. 134, 42 A. 515, 516 (R.I. 1899) (suggesting that town could sue to enjoin violation of contract en-

tered into for benefit of public); *compare Miree,* 433 U.S. at 28–30, 97 S.Ct. 2490 (state law governs whether claimed third-party beneficiary has standing to sue under contract between defendant and Federal Aviation Administration), *with Price,* 823 F.2d at 1119–20 (distinguishing *Miree* and holding that federal law governs whether claimed third-party beneficiary has standing to sue under contract approved by Department of Housing and Urban Development).

In our view, it is enough for a preliminary injunction that the language of the parking agreement applies on its face to all parking rates (except as provided in subsection (c)) and does not exclude any class of riders. True, the parking agreement has a "purpose" section that lists the agreement's aims, the first of which is to ensure adequate capacity for "users of intercity rail passenger service, at [parking] rates that will not discourage such use." But there is a second stated purpose to ensure "rail passengers" will not be "discriminated against" in parking rates. And even if only intercity passengers were of concern, the FRA letter indicates that the agency views Providence-based commuters to Boston as intercity passengers.

Capital Properties refers to other documents and past practice to support a narrow reading of the rates covered by the parking agreement or at least to constrain the FRA to approve the rate increases here at issue. Possibly these claims have some force but they certainly depend on reading sections 6(b) and (c) somewhat more narrowly than their literal language suggests. Without prejudice to a more developed argument along these lines, Capital Properties has not shown us any reason to think that the district court misjudged the matter in concluding that the state's position on this point was sufficiently strong to justify preliminary relief.

Of course, if it were clear that the FRA would ultimately have to approve the full increase sought, it might be inequitable to enjoin the increase merely based on a technical breach. *Cf. Ocean Spray Cranberries, Inc. v. Pepsico, Inc.*, 160 F.3d 58 (1st Cir.1998). But at this stage it is far from clear to us that the FRA had any such automatic obligation. The agreement speaks of "appropriate justification" by the garage and the FRA's obligation not "unreasonably [to] withhold approval" if the interests of intercity rail passengers are not "adversely affected." Again, this is without prejudice to a more developed argument by Capital Properties.

Capital Properties also says that if it has breached its agreement and raised rates unlawfully, money damages would be an adequate remedy. It is true that equity may deny an injunction where contract breach can be completely repaired through money judgment, *see Restatement, supra,* § 359(1), but that assessment ordinarily turns very much on the facts, and injunctions against contract breach are common where there is some reasonable doubt about whether damages can be sufficient, *see Ross–Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 20 & n. 7 (1st Cir.1996) (citing cases). The district court's judgment on this matter is due considerable deference, especially at the preliminary relief stage. *Id.* at 20.

In this instance, a substantial number of travelers would be forced to pay higher rates if the increase went into effect prior to FRA approval. To recover these amounts in breach of contract suits would involve substantial and complicated litigation. And, in the meantime, a number of passengers might think that they had to abandon rail travel in favor of travel by car, possibly adding to pollution and certainly to congestion in Providence, Boston or both. At least at this stage, granting preliminary relief based on an apparently clear violation of the parking agreement was equitably justified.

Finally, Capital Properties asserts that the district court erred by not requiring a bond to protect it against damages due to the grant of an injunction. However, while the request was made at the TRO stage and denied, it was apparently not renewed in relation to the preliminary injunction until after the oral ruling granting the preliminary injunction was issued. As far as we can tell, the bond request is now pending in the district court, and we are confident the district court will act promptly on the request.

The state has suggested that no bond is required because the injunction is now moot, but the suggestion is frivolous. It is true that relief was originally sought in the face of Capital Properties' failure to apply to the FRA for an increase, and it has now done that; but the state has pursued and obtained an injunction that continues in force today, namely, an injunction against an increase even after application has been made to the FRA *until* the FRA either approves it or further order of the court is obtained. Thus, Capital Properties is clearly being affected each day by a loss of revenues that it would obtain if the injunction were not in force and the rate increases were placed immediately into effect.

Whether a bond is required is a more complicated matter, *see, e.g., In re Kingsley,* 802 F.2d 571, 578–79 (1st Cir.1986), but it has not yet been addressed by the district court. If the district court declines to modify the injunction to condition it on the posting of a bond, Capital Properties is free to seek review from that denial; and if a bond is ordered and the state believes it should not have been, that issue can also be raised with us. Whether these issues would be covered by the injunction "modification" provision, 28 U.S.C. § 1292(a)(1), or the collateral-order doctrine need not now be decided. *See* 16 Wright, Miller & Cooper, *Federal Practice & Procedure* §§ 3914.2, 3924.2 (2d ed.1996).

There apparently remains in the district court a motion by the state to join the FRA as a necessary party, as well as a motion by Capital Properties to dismiss the state's claim on the ground that the FRA is an indispensable party that cannot feasibly be joined. Similarly, the district court will have to consider in due course how the pendency of Capital Properties' latest suit in the Court of Claims should affect further proceedings in the present case. These issues were not properly presented on appeal, and we take no position on them.

*Affirmed.*