**AROOSTOOK BAND OF MICMACS, Plaintiff**

v.

**EXECUTIVE DIRECTOR MAINE HUMAN RIGHTS COMMISSION, Defendant**

**No. CIV. 03–24–B–K.**

United States District Court, D. Maine.

Feb. 24, 2004.

Douglas J. Luckerman, Lexington, MA, Gregory P. Dorr, Farrell, Rosenblatt & Russell, Nathaniel M., Rosenblatt, Farrell, Rosenblatt & Russell, Bangor, ME, for Aroostook Band of Micmacs, Plaintiff.

Paul Stern, Assistant Attorney General, Christopher C. Taub, David G. Webbert, Johnson & Webbert, LLP, Matthew Sherburne Keegan, Johnson & Webbert, LLP, Augusta, ME, for Executive Director, ME

Human Rights Commission, Members, ME Human Rights Commission, Lisa Gardiner, Tammy Condon, Beverly Ayoob, Defendants.

### MEMORANDUM OF DECISION ON CROSS MOTIONS FOR SUMMARY JUDGMENT[1]

KRAVCHUK, United States Magistrate Judge.

This is an action by the Aroostook Band of Micmacs seeking relief in this federal forum in the hopes of forestalling current and future investigations and complaints against the Band under the Maine Human Rights Act and the Maine Whistle Blower Protection Act. The Executive Director and the Members of the Maine Human Rights Commission, and three former employees of the Band[2] are the defendants. The parties have filed cross-motions for summary judgment (Docket Nos. 36, 40, 41) and on January 23, 2004, I heard oral argument by the Band and the Commission defendants. Because I conclude that this Court does not have jurisdiction over this controversy, I **DISMISS** this action based upon lack of subject matter jurisdiction.

### Discussion

The Band characterizes this as a case under federal law about whether Congress has granted the State of Maine authority over the Band's sovereign government. (Pl.'s Mot. Summ. J. at 1.) They view the Commission's investigation of the Band

1. Pursuant to Federal Rule of Civil Procedure 73(b), the parties have consented to allow the United States Magistrate Judge to conduct any and all proceedings in this matter.

2. Lisa Gardiner, Tammy Condon, and Beverly Ayoob are the three individual defendants. Gardiner and Condon have filed suits in the state court and those suits have been stayed pending the outcome of this action. These

two defendants have filed a motion seeking judgment in their favor should the Commission defendants prevail. (Docket No. 40.) At the time these motions were filed Ayoob's charges of discrimination were still being investigated by the Maine Human Rights Commission. Ayoob is proceeding *pro se* in this forum and has not filed any pleadings in this summary judgment stage of the federal litigation.

with respect to the discrimination complaints of the three individual defendants as an impermissible impingement of their sovereignty in violation of the Band's federal rights. Key to the Band's paradigm is the Band's contention that, because the Band never followed through with written certification of its agreement to the Maine Micmac Settlement Act (MMA), 30 M.R.S.A. § 7201 et seq., the Maine settlement act is a nullity.[3] The status of the Band's sovereignty, the Band believes, requires an interpretation of the effect on the Band of a trio of pre and post MMA statutes: the Maine Implementing Act (MIA), 30 M.R.S.A. § 6201 et seq., the Maine Indian Claims Settlement Act (MICSA), 25 U.S.C. §§ 1721 et seq., and the Aroostook Band of Micmacs Settlement Act (ABMSA), 25 U.S.C. § 1721 note. Ultimately, the Band would like the Court to reach the conclusion that the interplay of these acts vis-à-vis the Band has left its inherent tribal sovereignty unscathed and that the Congress has not delegated any of its Constitutional and Statutory authority over the Band to the State of Maine.[4]

The defendants claim that what really is at issue between the parties is whether the Band is subject to the anti-discrimination provisions of the Maine Human Rights Act (MHRA) and the Maine Whistleblowers' Protection Act (MWPA) vis-à-vis the termination of the three employee defendants. (Defs.' Mot. Summ. J. at 1.) And, although they would just as soon have the court reach the merits of this lawsuit, the defendants are of the view that the Band is doing little else than raising in this federal suit defenses to the state MHRA and MWPA actions and that, as such, their claims do not "arise under" federal law when analyzed under the well-pleaded complaint rule. (*Id.* at 3–13.)

With some reluctance I accept the State's somewhat equivocal invitation to view the Band's complaint through the prism of the well-pleaded complaint rule; I must, as it is a question of jurisdiction that I have an obligation to decide, irrespective of the parties' positions on the matter. *See American Policyholders Ins. Co. v. Nyacol Prods., Inc.,* 989 F.2d 1256, 1258 (1st Cir.1993) ("Notwithstanding this accord, we must pursue the matter. Litigants cannot confer subject matter jurisdiction by agreement."); *Narragansett Indian Tribe R.I. v. Rhode Island,* 296 F.Supp.2d 153, 159 (D.R.I.2003) ("The parties' cooperative effort to consolidate their cases in one court is admirable, but mutual desire and convenience is plainly insufficient to confer subject matter jurisdiction."); *Wiener v. Wampanoag Aquinnah Shellfish Hatchery Corp.,* 223 F.Supp.2d 346, 350 n. 6 (D.Mass.2002) ("Irrespective of the vigor with which parties contest jurisdictional issues, however, it is the independent obligation of the court to assure itself it has jurisdiction in the first place.").

### The Band's Complaint through the Prism of the Well–Pleaded Complaint Rule

The Band is seeking declaratory relief pursuant to 28 U.S.C. § 2201, which allows for declaratory relief in "a case of actual controversy" within this Court's jurisdiction. 28 U.S.C. § 2201(a). *See also Houlton Band of Maliseet Indians v. Houlton,* 950 F.Supp. 408, 410 (D.Me.1996) (discussing the § 2201(a) "case and controversy" requirement).

---

**3.** Evidently neither the Band nor the State realized that this certification requirement had been inserted into the MMA's effectiveness mechanism.

**4.** The Band also argues that federal anti-discrimination law preempts or exempts them from the Maine acts. I address this contention below.

Section 1331 of title 28 provides that this Court "shall have original jurisdiction of all civil actions *arising under* the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331 (emphasis added). Also at play in this case is § 1362, of title 28 which endows the district courts with "original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy *arises under* the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1362 (emphasis added).

Although the phrase "arising under" seems simple enough on the surface, untangling the strands of precedent that have analyzed the concept in the framework of the well-pleaded complaint rule is hardly a facile undertaking, *see Templeton Bd. Sewer Comm'rs. v. American Tissue Mills Mass., Inc.*, 352 F.3d 33, 36 (1st Cir.2003) ("Determining whether "arising under" jurisdiction exists is a particularly difficult task."), even with the assistance of the very able briefing and oral argument by the attorneys in this case. I have heeded each side's argument and studied the proffered precedents and I keep coming back around to a conviction that the conclusion to the jurisdictional dispute ar-

rived at by (then Chief) Judge Homby in his two decisions on the issue, *Penobscot Nation v. Georgia–Pacific Corp.*, 106 F.Supp.2d 81 (D.Me.2000) (*Penobscot Nation I*) and 116 F.Supp.2d 201 (2000) (*Penobscot Nation II*) (order on motion for reconsideration), is the conclusion I must arrive at in this case.[5]

The District Court litigation in *Penobscot Nation* arose when three paper companies threatened to initiate state court suit(s) against the Penobscot Nation and Passamaquoddy Tribe to compel them to turn over certain documents under the Maine Freedom of Access Act. *Penobscot Nation I*, 106 F.Supp.2d at 82. The Tribes responded to the notice of claim by filing a federal lawsuit against the wannabe state court plaintiffs seeking an injunction against any state court lawsuit and a declaratory judgment that the Maine Freedom of Access Act violated the Tribes' federal right to be free of such state regulation. *Id.*

### Section 1331 Analysis

Drawing extensively from the same United States Supreme Court precedent batted about by these parties, the § 1331 "arising under" discussion in *Penobscot Nation I* is as follows:

---

5. In affirming the dismissal of the Penobscot Nation's complaint on other grounds, the First Circuit described the question of whether the well-pleaded complaint rule dictated dismissal as a "difficult question," *Penobscot Nation v. Georgia–Pacific Corp.*, 254 F.3d 317, 320 (1st Cir.2001) (*Penobscot Nation III*), describing the order on the motion to dismiss as "very able," *id.* at 321. It stated: "The district court's treatment of the issue under section 1331 is straightforward and, with one possible qualification as to nomenclature, arguably correct." *Id.* at 322 ("The qualification is that under *Bell v. Hood*, 327 U.S. 678, 685, 66 S.Ct. 773, 90 L.Ed. 939 (1946), and its progeny, the Supreme Court has often said that a *colorable* claim of a federal cause of

action will confer subject matter jurisdiction even though the claim itself may fail as a matter of law on further examination."). In *Templeton Board of Sewer Commissioners,* the First Circuit responded to the parties citation of its *Penobscot Nation I* § 1331 discussion: "While that case engaged in some analysis of the issue of federal jurisdiction," the Court observed, "we held that regardless of the jurisdictional issue, the district court was bound by the ruling of the Supreme Judicial Court of Maine. Therefore, the case was decided on issue preclusion grounds, not under § 1331, and is irrelevant to the present issue." 352 F.3d 33, 39 n. 6 (1st Cir.2003). The reach of the "arising under" § 1362 jurisdiction remains, likewise, unclear.

"Arising under" has been narrowly interpreted: when a plaintiff has a claim created by state law and a defendant has a federal defense, the Supreme Court has made clear that the lawsuit does not "arise under" federal law and that there is no general federal question jurisdiction. *See Franchise Tax Bd. of State of California v. Construction Laborers Vacation Trust*, 463 U.S. 1, 9–12, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983). This has come to be known as the "well-pleaded complaint rule," "the basic principle marking the boundaries of the federal question jurisdiction of the federal district courts." *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 63, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987); *see also American Nat. Red Cross v. S.G.*, 505 U.S. 247, 258, 112 S.Ct. 2465, 120 L.Ed.2d 201 (1992) ("The 'well-pleaded complaint' rule applies only to statutory 'arising under' cases...") (citations omitted). As a result, the plaintiff cannot file the case in federal court, *see, e.g., Iowa Management & Consultants, Inc. v. Sac & Fox Tribe*, 207 F.3d 488, 489 (8th Cir.2000); *TTEA v. Ysleta Del Sur Pueblo*, 181 F.3d 676, 681 (5th Cir. 1999), and the defendant cannot remove it to federal court, *see Oklahoma Tax Com'n v. Graham*, 489 U.S. 838, 840–41, 109 S.Ct. 1519, 103 L.Ed.2d 924 (per curiam).

The answer is the same if the defendant acts first and brings a declaratory judgment action in federal court seeking a declaration that its federal defense trumps the plaintiff's state law claim. Although the defendant has thereby become the plaintiff and ostensibly has pleaded a claim that is federal, there still is no federal jurisdiction. Specifically, in 1983 the United States Supreme Court announced that a 1950 decision (*Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 70 S.Ct. 876, 94 L.Ed. 1194) "has come to stand for the proposition that 'if, but for the availability of the declaratory judgment procedure, the federal claim would arise only as a defense to a state created action, jurisdiction is lacking.'" *Franchise Tax Bd.*, 463 U.S. at 16, 103 S.Ct. 2841 (*quoting* 10A Charles A. Wright, Arthur R. Miller and Mary Kay Kane, *Federal Practice and Procedure* § 2767, at 744–45 (2d ed.1983)). This statement made definitive what had been suggested in *Public Service Commission v. Wycoff Co.*, 344 U.S. 237, 73 S.Ct. 236, 97 L.Ed. 291 (1952):

> Where the complaint in an action for declaratory judgment seeks in essence to assert a defense to an impending or threatened state court action, it is the character of the threatened action, and not of the defense, which will determine whether there is federal-question jurisdiction in the District Court. If the cause of action, which the declaratory defendant threatens to assert, does not itself involve a claim under federal law, it is doubtful if a federal court may entertain an action for a declaratory judgment establishing a defense to that claim. This is dubious even though the declaratory complaint sets forth a claim of federal right, if that right is in reality in the nature of a defense to a threatened cause of action.

344 U.S. at 248, 73 S.Ct. 236.

106 F.Supp.2d at 82–83. The Court then explained in a footnote:

> There is confusing language in *National Farmers Union Ins. Companies v. Crow Tribe of Indians*, 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818(1985). There, the Supreme Court stated:
>
> > The question whether an Indian tribe retains the power to compel a non-Indian property owner to submit to

the civil jurisdiction of a tribal court is one that must be answered by reference to federal law and is a "federal question" under § 1331. Because petitioners contend that federal law has divested the Tribe of this aspect of sovereignty, it is federal law on which they rely as a basis for the asserted right of freedom from Tribal Court interference. They have, therefore, filed an action "arising under" federal law within the meaning of § 1331.

471 U.S. at 852–53, 105 S.Ct. 2447 (footnote omitted). As phrased this federal issue sounds like a defense. But such a reading makes it inconsistent with the well-pleaded complaint rule, which the Supreme Court has otherwise endorsed. Alternatively, *National Farmers* can be read to say that a Tribe's assertion of power over an outsider must be premised upon federal law. This reading makes it parallel to *Oneida Indian Nation v. County of Oneida,* 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974) (dealing with a land claim), and consistent with the well-pleaded complaint rule. *See Chilkat Indian Village v. Johnson,* 870 F.2d 1469, 1473–75 (9th Cir.1989) (citing *Oneida* and *Farmers Union* in support of federal jurisdiction in a case that presented a "close" question whether the Village's claim to enforce its ordinance arose under federal law).

*Id.* at 83 n. 3. Based on this analysis, the Court concluded that the Tribes' potential defense to the state lawsuit did not, under the well-pleaded defense rule, give the federal court § 1331 jurisdiction. *Id.* at 83.

On appeal the First Circuit picked no bones with this conclusion:

[A]s the district court pointed out in its very able decision, *Penobscot I,* 106 F.Supp.2d at 82, it is not enough to satisfy traditional "arising under" jurisdiction under section 1331 that a case involve a federal issue. Although this would certainly satisfy Article III, the Supreme Court has read the identically-worded statutory grant more narrowly, *Verlinden B.V. v. Cent. Bank of Nigeria,* 461 U.S. 480, 494–95, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983), and has, for some time, required that it be apparent from the face of the plaintiff's complaint either that a cause of action arise under federal law, *Am. Well Works Co. v. Layne & Bowler Co.,* 241 U.S. 257, 259–60, 36 S.Ct. 585, 60 L.Ed. 987 (1916), or at least (in some cases) that a traditional state-law cause of action (*e.g.,* a tort or contract claim) present an important federal issue.

This latter exception, often associated with *Smith v. Kansas City Title & Trust Co.,* 255 U.S. 180, 201–02, 41 S.Ct. 243, 65 L.Ed. 577(1921), might include a case in which a state-law contract claim rests on a federal regulatory requirement. *E.g., Price v. Pierce,* 823 F.2d 1114, 1120–21 (7th Cir.1987), *cert. denied,* 485 U.S. 960, 108 S.Ct. 1222, 99 L.Ed.2d 422(1988). This circuit treats *Smith* as good law but as limited to cases where an important federal issue is a central element in the state claim. *Almond v. Capital Props., Inc.,* 212 F.3d 20, 23–24 nn. 2–3 (1st Cir.2000). The Tribes in this case do not rely on *Smith.*

In all events, there remains an overriding requirement that the federal claim or issue appear on the face of "a well [*i.e.,* properly] pleaded complaint," so that federal jurisdiction is absent where the federal issue would arise only as a defense to a state cause of action. *Louisville & Nashville R.R. Co. v. Mottley,* 211 U.S. 149, 153–54, 29 S.Ct. 42, 53 L.Ed. 126 (1908). As a settled corollary, the restriction cannot be avoided by having the beneficiary of the defense assert the defense preemptively in a claim for declaratory or injunctive relief. This is

just what the district court said that the Tribes were attempting to do.

254 F.3d at 321–22. (footnote omitted).[6]

■ In the case at hand I must look at the individual defendants' MHRA and MWPA complaints as they are tendered in the state court. Here is how I see that playing out. The state-court actions against the Band go forward. The Band answers and asserts as affirmative defenses the contents of their three (non-Title VII) counts in this declaratory action. One affirmative defense (Count I of this complaint) is that because the MMA did not take effect, and ABMSA impliedly repealed the provisions of MIA and the MICSA applicable to the Band, the Band retains its inherent tribal authority and the Band, therefore, cannot be sued under the State's anti-discrimination acts. Another affirmative defense (Count II of this complaint) alleges that the band's tribal sovereign immunity, as a matter of federal law, bars the enforcement of the MHRA and the MWPA against the Band and that the Commission's continued enforcement of the MHRA and the MWPA against the Band violates federal law, e.g., the Supremacy Clause and ABMSA. Last, but certainly not least, is the tail that wags this dog: The third affirmative defense (Count V here) alleges that the Band is not a "person" and thus not an "employer" within the meaning of either the MHRA or the MWPA as those terms are defined in the two acts and, thus, the Band is not subject under state law to suit under the acts.

It is the Band's argument on this third ground, made with some force in the beginning of its motion for summary judgment, which drives home the fact that the counts implicating federal law are but defenses to the state law claims. It is not even clear as a matter of state law whether or not the Band is subject to suit under the MHRA and/or the MWPA per those acts' respective definitions of person and employer. If the answer to this state law question is negative, there is no case or controversy vis-à-vis the settlement act questions raised in Counts I and II. These counts involving federal questions only spring to life as defenses should the presiding court determine that one or other of the state anti-discrimination acts applies, by internal statutory definition, to the Band. This reality makes the Band's § 1331 case less persuasive than that of the Penobscot Nation plaintiffs'.

With respect to the Count I concern about the impact of the Band's failure to follow-through with written certification on the validity of the MMA, this too poses, first off, a substantial question of state law. How would the Maine courts respond to this scenario where there is an allegedly unintentional failure on the Band's part to complete a ministerial act, but where the Band accepts the benefit of the bargain and the State, the Band, and the United States Congress, operated for quite some time under the assumption that the State act did take effect as planned?[7] This question, too, must be answered in a man-

6. In a footnote the Court offered: "Although the Supreme Court has cited Smith with approval, its present scope remains in some doubt. See Merrell Dow Pharm. Inc. v. Thompson, 478 U.S. 804, 808–10 n. 5, 813–15 n. 12, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986); Franchise Tax Board v. Constr. Laborers Vacation Trust, 463 U.S. 1, 9, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983)." Id. at 463 U.S. 1 n. 3, 103 S.Ct. 2841.

7. I recognize that in Akins the First Circuit characterized as a question of federal law the

interpretation of "internal tribal matters" in the Penobscot and Passamaquoddy Maine settlement act. See Akins v. Penobscot Nation, 130 F.3d 482, 485 n. 4 (1st Cir.1997). There was a clearer iteration of the reason for this characterization in Fellencer: "Because the phrase 'internal tribal matters' was adopted by the federal Settlement Act, the meaning of that phrase raises a question of federal law." 164 F.3d at 708 (citing Akins, 130 F.3d at 485). Thus while the content of a state statute may be relevant to the interpretation of

ner that nullifies the MMA (at least in part) before a court would or should reach the federal law inquiry into the status of the Band's sovereignty vis-à-vis the State and the Federal governments. *See cf. Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 382, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992) (injunctive relief vis-à-vis enforcement of state regulations must be limited to cases where the application of the regulation is imminent, as "[a]ny other rule (assuming it would meet Article III case-or-controversy requirements) would require federal courts to determine the constitutionality of state laws in hypothetical situations where it is not even clear the State itself would consider its law applicable.").

With respect to the First Circuit discussion of *Smith, Franchise Tax Board, Price,* and *Almond* in *Penobscot Nation III*, I conclude that this case does not warrant more than a statement of the obvious to dispatch any suggestion that it raises the "legal quandary" "generally referred to as the litigation-provoking problem, or the presence of a federal issue in a state-created cause of action." *Templeton Bd. Sewer Comm'rs*, 352 F.3d at 37 (citing *Merrell Dow [Pharm., Inc. v. Thompson]*, 478 U.S. [804,] 809–10, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986)). The private claims against the Band under MHRA and MWPA do not have an important federal issue as a central element, *see Penobscot Nation III*, 254 F.3d at 321(citing *Smith*, 255 U.S. at 201–02, 41 S.Ct. 243); *Gattegno v. Sprint Corp.*, 297 F.Supp.2d 372, 375 (D.Mass.2003), and the individual state-law discrimination claims do not rest on a federal regulatory requirement. *See Smith,*

255 U.S. 180, 201–02, 41 S.Ct. 243, 65 L.Ed. 577 (1921); *Penobscot Nation III*, 254 F.3d at 321 n. 3. The resolution of the state court plaintiffs' entire case may not even require *some* application of federal law, a dynamic that would be a far cry from rising to the level of "a *substantial* question of federal law." *Templeton Bd. Sewer Comm'rs*, 352 F.3d at 41.

Examining the precedents proffered by both sides, this simply is not a case that poses a question of whether "federal jurisdiction exists because the federal issue of tribal sovereignty will *inevitably* come up in the lawsuit." *Penobscot Nation II*, 116 F.Supp.2d at 203 (emphasis added). *Compare Cayuga Indian Nation N.Y. v. Union Springs*, 293 F.Supp.2d 183, 190 (N.D.N.Y. 2003) ("Here, unlike in *Penobscot,* neither the Nation nor the federal government has expressly agreed that the Nation is subject to state or local zoning regulations. Therefore, the issue of whether the Property is Indian Country, which is a substantial question of federal law, must be resolved in order to give either party the relief requested. For this reason, *Penobscot* is clearly not controlling here."); *see also id.* at 191. The same principle holds true for the cases analyzing the question under the declaratory relief "case and controversy" motif. *See Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1241–42 (10th Cir.2001) (tribe having established its own motor vehicle registration and title system presented a "case and controversy" and had standing to pursue declaratory relief, having received indications from the state that the tribal registrations and titles would not be recognized outside the reservations and with tribal

---

federal law, that possibility does not make the state ratification process into a federal question. Indeed, at oral argument the Band was adamant, with respect to any contention that the later ABMSA ratified the MMA despite the notification miss-cue, that Congress cannot tell the State how to enact its settlement legis-

lation because this was squarely a matter under State law. On the other hand, a federal question would arise if what was at issue was a dispute about the statute's text concerning the status of the Band's sovereignty vis-à-vis the State under the MMA as adopted by ABMSA.

registrants having been cited three times and warned once by the state); *Rhode Island v. Narragansett Indian Tribe,* 19 F.3d 685, 693 (1st Cir.1994) (undertaking a ripeness analysis in a declaratory action by a tribe seeking to establish gaming on tribal land); *Houlton Band of Maliseet Indians,* 950 F.Supp. at 410 (undertaking a 28 U.S.C. § 2201(a) "case and controversy" analysis, observing that the town had assessed taxes, issued tax liens, and threatened foreclosure and the declaratory claim involved "certain and definite events that would have immediate effect absent the Court's declaration of the Plaintiffs' rights" under the federal Indian Land Claims Settlement).

■ I also do not consider *this* case to be postured in a manner that invites *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) injunctive relief. *State officials* are not seeking to enforce a state regulation in violation of the Band's federal rights. As to the three private actions under the state laws looming in this case, the Commission defendants are not state regulators that are threatening to take action against the Band to enforce a regulatory scheme as was the case in *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983) and *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 112 S.Ct. 2031, 119 L.Ed.2d 157(1992).[8] I appreciate, with the assistance of *Philip Morris Inc. v. Harshbarger,* 946 F.Supp. 1067, 1071–72 (D.Mass. 1996), the murky waters one can wade into

in applying the § 1331 "arising under"/well-pleaded complaint rule, while heeding the *Ex parte Young* jurisdictional call, and attempting to understand the relevance of the different outcomes reached in *Public Service Commission of Utah v. Wycoff Co.,* 344 U.S. 237, 73 S.Ct. 236, 97 L.Ed. 291 (1952) and *Shaw* and *Morales.* However, as in *Colonial Penn Group, Inc. v. Colonial Deposit Co.,* 834 F.2d 229 (1st Cir.1987) and *Nashoba Communications Ltd. Partnership No. 7 v. Town of Danvers,* 893 F.2d 435 (1st Cir.1990), the state law cases the Band seeks to enjoin are by private individuals and I think there is a distinction of some significance between the threat of the application of a state regulation or law against the federal declaratory plaintiff *by* a state regulatory agent, whether the threatened sanction be civil or criminal (as was the case in *Philip Morris* ), *see e.g., Summit Medical Assocs. v. James,* 998 F.Supp. 1339 (M.D.Ala. 1998), and the Maine Human Right's Commission's investigatory/quasi-judicial role in essentially pre-screening what are at heart lawsuits by private citizens seeking a remedy that will redound to the private plaintiffs on a case-by-case basis. (I certainly could not enjoin the state courts from proceeding with its review of the plaintiff discrimination suits. *See* 28 U.S.C. § 2283.) The parties acknowledge that the Band's request for declaratory relief vis-à-vis the status of its inherent sovereignty might take on a whole new complexion if the Band was asserting, say, a right to hunt without a state license.[9]

---

**8.** On this score, *Morales* concluded: "We think *Young* establishes that injunctive relief was available here. As we have described, the attorneys general of seven States, including petitioner's predecessor, had made clear that they would seek to enforce the challenged portions of the guidelines (those concerning fare advertising) through suits under their respective state laws." *Morales,* 504 U.S. at 381, 112 S.Ct. 2031.

**9.** The complexion of *this* case would be different also if the Commission had issued a subpoena to force the Band to turn-over information. However, I am not convinced that such a change of posture would cause me to embrace, without hesitation, the case at the opening salvo, as there are still two layers of Maine law that must be worked through before considering any defenses relating to the scope of the Band's sovereignty under federal law. It is unclear under Maine law whether

### Section 1362 Analysis

I also stage a revival of *Penobscot Nation I & Penobscot Nation II* with respect to the § 1362 analysis (left dormant by the First Circuit), recognizing that this jurisdictional question presents an even more troublesome quandary than § 1331, as it remains unclear how far that provision is meant to reach with respect to conferring federal jurisdiction over suits to which Indian tribes or bands are a party.

On this score, the First Circuit stated in *Penobscot Nation III*:

In this case the Tribes say that even if section 1331 does not support jurisdiction, section 1362 will do so. The "arising under" language in the two statutes is parallel; and the purpose of section 1362 was probably just to confer federal jurisdiction where it otherwise would exist over Indian cases without regard to the amount-in-controversy requirement that governed section 1331 at the time (but has been since repealed). *See Blatchford v. Native Village of Noatak*, 501 U.S. 775, 784, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991). Yet, the Supreme Court has not settled definitively the question whether section 1362 reaches any further, and if so, how far, beyond section 1331. *See Blatchford*, 501 U.S. at 784–85, 111 S.Ct. 2578; *Moe v. Confederated Salish & Kootenai Tribes*, 425 U.S. 463, 472–75, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976).

254 F.3d at 322–23.

The District Court in *Penobscot Nation I* went to some pains to parse the signifi-

cance of § 1362. The opinion fully discusses the history and commentary associated with § 1362 since its adoption in 1996. Ultimately, Judge Hornby concluded that § 1362 does not expand the jurisdictional reach of "arising under" jurisdiction in a case such as this one. *Penobscot Nation I*, 106 F.Supp.2d at 86, ("In sum, the 'arising under' language of the two jurisdictional statutes is in all material respects comparable; the modern case law reads them as largely equivalent; and even the 'something more' of *Moe* and *Blatchford* seems to be limited to suits the United States might have brought as trustee."). I can add nothing further to the analysis contained within that decision.

In ruling on the motion for reconsideration, the District Court further reasoned with respect to the First Circuit's *Penobscot Nation v. Fellencer*, 164 F.3d 706, 708 (1st Cir.1999):

The Tribes argue that the paper companies cannot make the case that the state Freedom of Access Law applies, however, without using federal law, and therefore that jurisdiction exists even under the well-pleaded complaint rule. The argument goes as follows. The Freedom of Access Law, by its terms, applies to municipalities. It is the separate Implementing Act upon which the paper companies must rely to hold the Tribes to some of the responsibilities of municipalities. But the Implementing Act could not become effective without ratification by Congress. Therefore, the pa-

the Maine discrimination laws are even applicable to the Band. Prior federal cases on this subject have assumed that because the MHRA does not contain an exemption for the tribes, they are covered entities. However, in this case the Band forcefully argues that an Indian tribe does not fall within the state statutory definitions of "person" or "employer," an issue never considered by the Maine state courts. In the case of the hunting without a

license hypothetical, Maine law clearly prohibits these acts and the state regulatory powers would be brought to bear, as in the case of the Kansas vehicle licensing and registration laws in *Prairie Band of Potawatomi Indians*, 253 F.3d 1234. Additionally, the ratification issues surrounding the MMA have yet to be resolved and that state law issue would remain an initial layer even in a hunting without a state license hypothetical.

per companies' claim presents a federal claim under the well-pleaded complaint rule.

This argument fails because of Justice Cardozo's 1936 opinion in *Gully v. First National Bank*. Quoting in part from an earlier decision, he said:

The federal nature of the right to be established is decisive—not the source of the authority to establish it. Here the right to be established is one created by the state. If that is so, it is unimportant that federal consent is the source of state authority. To reach the underlying law we do not travel back so far. By unimpeachable authority, a suit brought upon a state statute does not arise under an act of Congress or the Constitution of the United States because prohibited thereby. With no greater reason can it be said to arise thereunder because permitted thereby.

299 U.S. 109, 116, 57 S.Ct. 96, 81 L.Ed. 70 (1936) (citation omitted). The same conclusion applies here. The fact that Congress ratified what Maine did and thereby permitted Maine to legislate concerning the Tribes—or that it prohibited Maine from doing so—does not suffice to let the Tribes meet the test for "arising under" federal jurisdiction.

But as I have said, the outcome of one recent First Circuit decision is difficult to square with this analysis. In *Fellencer*, the First Circuit ruled that the Penobscot Nation was entitled to a federal court injunction against the state court lawsuit of a terminated female employee who was suing the Nation for state-prohibited sex discrimination. *See* 164 F.3d at 707. The Nation's federal "claim" was that federal law—specifically, the "internal tribal matters" exception that the Tribes also assert here—prevented Maine courts from applying the Maine Human Rights Act. Under well-pleaded complaint analysis, that

"claim" sounds like a federal defense that the Nation could have asserted in state court—not enough to confer federal jurisdiction. Nevertheless, without mentioning the well-pleaded complaint rule, *Fellencer* assumed that jurisdiction existed. I have examined the trial court record from this District and discovered that the well-pleaded complaint rule was never briefed. The lawyer who represented the Penobscot Nation in that case is the lawyer for the Tribes in this case, and he informed me at oral argument that the well-pleaded complaint rule likewise was never mentioned on appeal. I do not therefore read *Fellencer* as having rejected the well-pleaded complaint rule for Indian cases.

116 F.Supp.2d at 203–05 (footnotes omitted). *See also Cayuga Indian Nation N.Y.*, 293 F.Supp.2d at 188; *see cf. Holmes Group, Inc. v. Vornado Air Circulation Systems, Inc.*, 535 U.S. 826, 832–34, 122 S.Ct. 1889, 153 L.Ed.2d 13 (2002) (discussing the continued applicability of well-pleaded complaint rule in the context of the patent-law "arising under" provision of 28 U.S.C. § 1338). My straight-up reliance on *Penobscot Nation I & Penobscot Nation II* is not simply a maneuver to save me time and effort; it also has the potential of saving the parties' time and effort. In terms of the legal questions of federal jurisdiction the dispute here is sufficiently parallel to that involved in *Penobscot Nation I & Penobscot Nation II* that the earlier analysis covers all the bases and it has been well-vetted by the First Circuit and the parties here (though without a final clean bill of health). I hesitate to add "something more" to my decision that might deflect this case from a straightforward resolution of whether or not there is "something more" to the "arising under" language of § 1362. I do observe that in this case the § 1362 "something more" would have to be even more expansive

than posed in *Penobscot Nation* where there was no argument that under *state* law the Maine Freedom of Access Act was inapplicable to the tribes irrespective of federal law, so the federal issue was bound to arise. As stated above, this case has the potential to be disposed of purely on state law grounds.

I recognize that my § 1331 and § 1362 determinations (absent an intervening review by the First Circuit) means that the Band *may* find itself in a position in which it must accept the Maine court's determination of the federal question of its sovereignty. I also recognize that some view this forum as unfriendly on this topic. Judge Hornby addressed this reality when he denied the Tribes' motion for reconsideration:

> The Tribes argue that the consequence of this reasoning is to deprive them of the federal protection of their sovereignty—that it is an affront to that sovereignty to have to appear in state court to assert the defense and even worse if the state courts reject it. The premise of the well-pleaded complaint rule, however, is that federal issues can be handled perfectly well by state courts (indeed, there is no constitutional requirement that Congress establish inferior federal courts) and are to be addressed there when they are a defense rather than part of the federal claim. Not surprisingly, the State, an intervenor in this lawsuit, claims that it would be affronted if the opposite result were

reached, because then every assertion of its jurisdiction under the Implementing Act would have to be raised in federal court, whereas part of the Indian Land Claims Settlement, it says, was to confirm state jurisdiction in enumerated areas. *See Passamaquoddy Tribe v. Maine,* 75 F.3d 784, 787 (1st Cir.1996) ("Among other things, the Settlement Act ... submitted the Passamaquoddies, the Penobscots, and their tribal lands to the State's jurisdiction."). Neither of these arguments affects the outcome here. The well-pleaded complaint rule exists. It has been criticized by the commentators, *see* 13B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3566, at 85, 89–90 (2d ed.1984), but until it is overruled, I simply apply it. *Penobscot Nation II,* 116 F.Supp.2d at 204–05.[10] As the well-pleaded complaint rule has not since been overruled, and I can perceive no alternative avenue to avoid the question in this case, I have applied it here to the best of my ability with the assistance of the earlier efforts of *Penobscot Nation I & Penobscot Nation II.* We remain without "a clear appellate ruling that it does or does not apply in cases where issues of Indian sovereignty are in dispute." *Id.* at 205. *See Penobscot Nation III,* 254 F.3d at 323.

### The Two Title VII Counts

■ If I could give any weight to the Band's assertions vis-à-vis the viability of

---

**10.** It is possible for disputes of this ilk to proceed simultaneously as a state enforcement action in a state forum and a federal declaratory action in the District Court. *See Narragansett Indian Tribe of Rhode Island,* at 160 (dismissing under the well-pleaded complaint rule the state's enforcement action under Rhode Island's Uniform Declaratory Judgments Act seeking a declaration that the Tribe's failure to comply with Rhode Island's cigarette sales and excise tax scheme was

unlawful, while proceeding to address the federal action by the Tribe seeking declaratory judgment that State could not enforce its cigarette sales and excise tax scheme against Tribe with respect to smoke shop located on Tribe's Settlement Lands). Under this scenario the tribe is free not to raise the federal law affirmative defense in the state action, *see Philip Morris Inc.,* 946 F.Supp. at 1078–79 n. 13, in an effort to assure that the federal question is answered in the federal forum.

Title VII exemption/preemption counts, then the case for "arising under" jurisdiction would have new vitality. However, I find the Band's argument on this score to be makeshift and makeweight.

Count III of the complaint asserts that, because Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e–2000e–17 exempts Indian Tribes from the definition of employers, Title VII is not applicable to the Band. The Band alleges that the Commission has a practice of filing charges of discrimination on behalf of the complaining individuals with the Equal Employment Opportunity Commission (EEOC) for dual filing purposes which is an impermissible assertion that Title VII is applicable to the Band. Even if I assume that the Commission is filing these charges with the EEOC, a practice which the State suggested at oral argument has been remedied, such act would have no possible operative effect under the law. The First Circuit addressed the Title VII exemption in *Fellencer* as it related to the Penobscot Nation. "Although we have refused to read into this reference an incorporation of 'all prior Indian law' because that 'would be inconsistent with the unique nature of the Maine settlement,'" the Court explained, "we also recognized that Congress 'explicitly made existing general federal Indian law applicable to the Penobscot Nation in the Settlement Act.'" 164 F.3d at 712 (quoting *Akins v. Penobscot Nation*, 130 F.3d 482, 489 (1st Cir.1997)). "That body of law includes Congressional enactments excluding Indian tribes from Title VII coverage and limiting civil rights claims against the tribes to tribal forums." *Id.* (citing *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 65–66, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978)). *See also Shannon v. Houlton Band of Maliseet Indians*, 54 F.Supp.2d 35, 38–41 (D.Me.1999). Al-

though the Band's (somewhat unsettled) status under the settlement acts is not identical to the Penobscot's, *see Boudman v. Aroostook Band of Micmac Indians*, 54 F.Supp.2d 44, 48 (D.Me.1999); *see also Shannon*, 54 F.Supp.2d at 38–41,[11] I do not doubt that the Band is correct in its argument that they are protected from suits under Title VII due to the exemption, which is a conclusion already reached by this District Court in *Boudman*, 54 F.Supp.2d at 49. The filing of any charges with the EEOC by the commission defendants' administrative staff is at most an ultra vires act and does not present any live case or controversy that would give this court subject matter jurisdiction.

■ Related to the above discussion is the theory of Count IV, which alleges that Title VII actually preempts the Maine acts to the extent that "the respective definitions of 'employer' contained in the MHRA and the MWPA include Indian tribes." I consider the question settled as to the Maine tribes: "[T]he Title VII exemption does not preempt state law with respect to the Band." *Shannon*, 54 F.Supp.2d at 40. *Shannon* drew this conclusion from the First Circuit's statement in *Fellencer* on the reach of *Houlton Band of Maliseet v. Maine Human Rights Commission*, 960 F.Supp. 449 (D.Me.1997): "The court in *Houlton Band* was opining on whether the Title VII exemption operated to preempt state law with respect to the Maliseet Indians, an outcome which clearly was not intended by the Settlement Act." 164 F.3d at 711 n. 3. While I recognize that the Band claims a different status than the Settlement Act confers upon the Maliseets, the fact remains that if the MHRA does not reach them under federal law it is because of their assertion that the MMA and the federal settlement acts have no

---

11. Circuit Judge Lipez provided a concise summary of the backdrop of the Penobscot and Passamaquoddy settlement process in *Fellencer. See* 164 F.3d at 707–08.

effect upon them, not because of the exemption found in Title VII. That exemption does not preempt the MHRA. As with Count III, Count IV does not raise a case or controversy conferring jurisdiction upon this court.

### *Conclusion*

Because I conclude that this complaint does not "arise under" federal law, I **DISMISS** the complaint, with its attendant cross-motions for summary judgment, based upon lack of subject matter jurisdiction. This jurisdictional determination applies to all the defendants including the single defendant who has not participated in the briefing.