**Jehad ALSHRAFI, Plaintiff,**

v.

**AMERICAN AIRLINES, INC. and Michael E. Blackstone, Defendants.**

**No. CIV.A.03–10212–WGY.**

United States District Court, D. Massachusetts.

June 8, 2004.

Kathryn Ann Catros, Palmer & Dodge, LLP, Boston, MA, for Jehad Alshrafi, Plaintiff.

Barbara J. Dougan, Lawyers' Committee for Civil Rights Under Law of the Bo Bar Assn., Boston, MA, for Jehad Alshrafi, Plaintiff.

Michael A. Fitzhugh, Fitzhugh, Parker & Alvaro, LLP, Boston, MA, for American Airlines, Inc, Michael Blackstone, Defendants.

Scott P. Lewis, Palmer & Dodge, LLP, Boston, MA, for Jehad Alshrafi, Plaintiff.

Peter E. Schwartz, Palmer & Dodge, LLP, Boston, MA, for Jehad Alshrafi, Plaintiff.

## MEMORANDUM AND ORDER

YOUNG, Chief Judge.

## I. INTRODUCTION

Since the terrorist attacks of September 11, 2001, this country has struggled to meet the stringent demands of national security and, simultaneously, to protect the civil rights of the American people. Some have argued that the practice of racial profiling, wherein law enforcement officials or others single out members of a particular race for heightened investigatory scrutiny, based primarily or exclusively on racial characteristics that allegedly correlate with criminality, represents a conflict between those twin goals. They argue that although members of all races are entitled to be treated equally, racial profiling is a rational and effective security measure. Others argue, much more persuasively, that racial profiling is not a legitimate security measure, and that at least in the realm of discrimination, liberty and security do not conflict. This case, however, does not present the question whether racial profiling is legitimate, but rather whether it occurred in a particular instance, and whether federal law preempts state law claims to relief for such conduct.

All parties to this action agree that on November 3, 2001, at Logan Airport in Boston, Massachusetts, the Plaintiff Jehad Alshrafi ("Alshrafi") was barred from boarding American Airlines Flight 181 bound for Los Angeles by the flight's captain, the Defendant Michael E. Blackstone ("Blackstone"). The basis for Blackstone's decision, however, is intensely disputed. Alshrafi, an Arab American and a Muslim, contends that Blackstone's refusal was motivated by unlawful discrimination. Blackstone counters that his actions were taken for legitimate security purposes.[1]

---

1. Although the particular facts of the underlying dispute are not relevant at present, they provide some useful background. A review of the record before this Court reveals that the core facts are in controversy. Blackstone testified that his refusal to allow Alshrafi to board Flight 181 was based on four security concerns allegedly communicated to him at the gate by Deputy United States Marshal Brian Renzi ("Deputy Marshal Renzi"): (1) that passengers had reported concerns about the passenger later identified as Alshrafi; (2) that the passenger had caused a disturbance at a security checkpoint; (3) that the passenger's name was close to one on a terrorist "watch list"; and (4) that the Marshal himself had concerns about this passenger. Defs.' Mot. Summ. J. [Doc. No. 18] ¶¶ 24–25 ("Defs.' Facts").

In stark contrast to Blackstone's account, Deputy Marshal Renzi stated that he told Blackstone only that he had received word from an American Airlines Passenger Service Representative that a female passenger complained about another passenger who made her nervous. Pl.'s Resp. Defs.' Facts [Doc. No. 24] ¶ 16 ("Pl.'s Facts"). According to Deputy Marshal Renzi, he did not mention a watch list to Blackstone, did not state that he had concerns about the passenger, and did not state that the passenger had been involved in any disturbance at a security checkpoint. Id. In addition, Alshrafi presents evidence that Deputy Marshal Renzi and American Airlines Customer Service Manager and Ground Security Coordinator Christine Konevich communicated to Blackstone that they did not consider Alshrafi a security risk and urged Blackstone to reconsider his refusal to allow Alshrafi to board. Id. ¶¶ 32–34. Blackstone again refused. Id. ¶ 35. It is undisputed that shortly thereafter American Airlines offered to re-book Alshrafi and allowed him to board another flight to Los Angeles. Id. ¶ 40; Defs.' Facts ¶ 40.

## II. BACKGROUND

In February 2002, Alshrafi filed a complaint against American Airlines and the (then unknown) captain of Flight 181 with the Massachusetts Commission Against Discrimination (the "Commission"). Notice of Removal [Doc. No. 3], Ex. A ("Compl.") ¶ 28. In January 2003, the Commission granted Alshrafi's request to withdraw his complaint and pursue a judicial action. *Id.* ¶ 29. On January 6, 2003, Alshrafi sued the unknown captain of Flight 181 (later identified as Blackstone) and American Airlines, Inc. (collectively "American Airlines") in the Massachusetts Superior Court sitting in and for the County of Suffolk, alleging that the captain's refusal to permit boarding amounted to unlawful discrimination based on Alshrafi's national origin, race, and religion. Specifically, Alshrafi claims that the refusal violated Mass. Gen. Laws ch. 272, §§ 92A, 98 (Count I) and constituted the intentional infliction of emotional distress (Count II). *Id.* ¶¶ 30–42. In its answer, American Airlines argues that Blackstone's actions were lawful under the Airline Deregulation Act, 49 U.S.C. § 44902(b), which grants air carriers discretion to "refuse to transport a passenger ... the carrier decides is, or might be, inimical to safety." *See* Ans. [Doc. No. 6] at 7. American Airlines also contends that Alshrafi's claims are preempted by the Airline Deregulation Act, 49 U.S.C. § 41713(b)(1), which prevents states from "enact[ing] or enforc[ing] a law ... related to a price, route, or service of an air carrier." *Id.*

American Airlines removed the case to this Court in February 2003. Notice of Removal. On January 23, 2004, American Airlines moved for summary judgment on both counts of the complaint [Doc. No. 18] and submitted a supporting memorandum [Doc. No. 21] ("Defs.' Summ. J. Mem."). Alshrafi filed his opposition to American Airlines' motion [Doc. No. 23] ("Pl.'s Summ. J. Opp'n") on February 6, 2004, and American Airlines filed its reply memorandum [Doc. No. 29] ("Defs.' Summ. J. Reply") on February 17, 2004. At oral argument on the summary judgment motion, this Court raised *sua sponte* the issue whether the removal to federal court was proper. The parties have since submitted supplemental briefs on the issue, [Doc. No. 30] ("Defs.' Jdn. Mem."); [Doc. No. 31] ("Pl.'s Jdn. Mem."), and this Court is now prepared to address the threshold question of whether it has subject matter jurisdiction over this dispute.

## III. DISCUSSION

American Airlines removed this case from the Massachusetts Superior Court pursuant to 28 U.S.C. § 1441(a), which provides that "any civil action in a State Court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or defendants, to the district court of the United States for the district and division embracing the place where such action is pending." *See* Notice of Removal ¶ 2. Federal courts have interpreted this removal statute narrowly and have placed the burden upon the removing party to demonstrate the existence of federal subject matter jurisdiction. *See, e.g., Kingsley v. Lania,* 221 F.Supp.2d 93, 95 (D.Mass.2002) (Dein, M.J.); *Therrien v. Hamilton,* 881 F.Supp. 76, 78 (D.Mass. 1995) (Ponsor, J.).

### A. Diversity Jurisdiction

The notice of removal filed in the instant case alleged that this Court has diversity jurisdiction over this dispute. Notice of Removal ¶ 3. The notice states that Alshrafi is a Massachusetts resident and that American Airlines, Inc. is incorporated in Texas. *Id.* At the time of removal, the

identity of Blackstone, a California resident, was unknown.[2] Although the notice of removal identifies Alshrafi as a Massachusetts resident, the complaint clearly states: "At the time of the incident . . ., Mr. Alshrafi resided in Cambridge, Massachusetts. Mr. Alshrafi currently lives in California." Compl. at 2. This inconsistency between the notice of removal and the complaint caused the Court to raise the question whether Alshrafi and Blackstone are in fact citizens of different states for purposes of diversity jurisdiction.[3]

■■■ In determining whether diversity jurisdiction extends to a suit, "residency and citizenship are not interchangeable." *Valentin v. Hosp. Bella Vista,* 254 F.3d 358, 361 n. 1 (1st Cir.2001). Instead, "citizenship usually is equated with domicile." *Id.* at 366. "A person's domicile is the 'place where he has his true, fixed home and principal establishment, and to which, whenever he is absent, he has the intention of returning.' Domicile requires both physical presence in a place and the intent to make that place one's home." *Id.* (quoting *Rodriguez–Diaz v. Sierra–Martinez,* 853 F.2d 1027, 1029 (1st Cir.1988)) (citation and internal quotation marks omitted). It is the burden of the party invoking diversity jurisdiction, here American Airlines, to demonstrate complete diversity. *See id.; Toste Farm Corp. v. Hadbury, Inc.,* 70 F.3d 640, 642 (1st Cir.1995).

■ If both Alshrafi and Blackstone were domiciled in California at the time the complaint was filed, then diversity jurisdiction is plainly lacking here.[4] Alshrafi contends that he had become a citizen of California by the time he filed his suit. Pl.'s Jdn. Mem. at 1. American Airlines neither disputes this contention nor provides this Court with any evidence of Alshrafi's domicile at the time of filing. *See* Defs.' Jdn. Mem. Therefore, American Airlines has failed to meet its burden of proof as the party invoking removal jurisdiction, leaving this Court with no choice but to rule that diversity jurisdiction is lacking in this case.

**B. Federal Question Jurisdiction**

As an alternative basis for jurisdiction, the notice of removal states that "this Court's jurisdiction is premised upon 28 U.S.C. § 1331, because Mr. Alshrafi's right to relief necessarily depends upon the resolution of a substantial question of federal law, the Federal Aviation Act, 49 U.S.C. § 44902." Notice of Removal ¶ 4. American Airlines further argues that its preemption defense raised under 49 U.S.C. § 41713(b) also extends federal question jurisdiction to this dispute. Defs.' Jdn. Mem. at 2.

■ It is well established that federal jurisdiction cannot rest on defenses or counterclaims, but rather depends on the well-pleaded complaint. *Franchise Tax*

---

**2.** The Court cannot imagine why counsel for American Airlines was unable to ascertain the identity of the captain on a specifically identified American Airlines flight before filing papers with two courts alleging that diversity jurisdiction existed.

**3.** It has been settled since *Strawbridge v. Curtiss,* 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806), that the diversity jurisdiction statute is interpreted to require that all defendants must be diverse from all plaintiffs, except in certain circumstances not present here. Con-

gress has yet to overrule this interpretation by statute.

**4.** It is of no consequence that Blackstone had not been identified as the defendant pilot, "John Doe," until after the complaint was filed. The First Circuit has stated that substitution of a non-diverse defendant for a fictitious party after removal destroys diversity jurisdiction. *See Casas Office Machs., Inc. v. Mita Copystar Am., Inc.,* 42 F.3d 668, 670, 675 (1st Cir.1994).

*Bd. v. Constr. Laborers Vacation Trust,* 463 U.S. 1, 10, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983) ("For better or worse, under the present statutory scheme as it has existed since 1887, a defendant may not remove a case to federal court unless the *plaintiff*'s complaint establishes that the case 'arises under' federal law." (citing, *inter alia, Louisville & Nashville R. Co. v. Mottley,* 211 U.S. 149, 152, 29 S.Ct. 42, 53 L.Ed. 126 (1908))); *In re Edwards,* 70 F.3d 1252, 1994 WL 868164, at *1 (1st Cir.1994) (unpublished table decision) ("A federal question that is raised as a defense or counterclaim by a defendant ... does not confer federal question jurisdiction or establish a basis for removal."); *see generally* 14B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3722. "[I]n deciding (for removal purposes) whether a case presents a federal 'claim or right,' a court is to ask whether the plaintiff's *claim to relief* rests upon a federal right and the court is to look only to the *plaintiff's complaint* to find the answer." *Hernandez–Agosto v. Romero–Barcelo,* 748 F.2d 1, 2 (1st Cir.1984) (citing *Gully v. First National Bank,* 299 U.S. 109, 112, 57 S.Ct. 96, 81 L.Ed. 70 (1936)); *see also Brae Asset Fund, L.P. v. Dion,* 929 F.Supp. 29, 30 (D.Mass.1996) (Woodlock, J.) ("In the ordinary removal setting it is only a defendant that can remove, and if the plaintiff's well-pleaded complaint discloses no basis for federal jurisdiction, the defendant must litigate the claims—even any affirmative federal defenses, or counterclaims, it may assert—in state court." (citations omitted)).[5]

■ An important corollary to the well-pleaded complaint rule is "the further principle that 'a plaintiff may not defeat removal by omitting to plead necessary federal questions.'" *Rivet v. Regions Bank of Louisiana,* 522 U.S. 470, 475, 118 S.Ct. 921, 139 L.Ed.2d 912 (1998) (quoting *Franchise Tax Board,* 463 U.S. at 14, 103 S.Ct. 2841). In other words, a plaintiff cannot disguise a federal cause of action, and thereby frustrate a defendant's right of removal, by "artfully pleading" her case to avoid any reference to federal law. Under the artful pleading doctrine, removal is proper (1) "where federal law completely preempts a plaintiff's state-law claim," *id.* (citing *Metropolitan Life Insurance Co. v. Taylor,* 481 U.S. 58, 65–66, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987), and *Avco Corp. v. Aero Lodge No. 735, International Ass'n of Machinists,* 390 U.S. 557, 560, 88 S.Ct. 1235, 20 L.Ed.2d 126 (1968)), or (2) where a well-pleaded claim sounding in state law "necessarily 'requires resolution of a substantial question of federal law,'" *Almond v. Capital Props., Inc.,* 212 F.3d 20, 23 (1st Cir.2000) (quoting *Franchise Tax Board,* 463 U.S. at 13, 103 S.Ct. 2841). *See also Metheny v. Becker,* 352 F.3d 458, 460–61 (1st Cir.2003). This latter ground for removal is often referred to as "federal ingredient" jurisdiction. *Id.* at 461.

In this case, Alshrafi's complaint makes absolutely no mention of Sections 41713(b) and 44902(b) of the Airline Deregulation Act (the "Act"), or of any other federal law. Therefore, the issues presented to this Court are (1) whether Alshrafi's state claims have been completely preempted by

---

**5.** *See also Merrell Dow Pharm., Inc. v. Thompson,* 478 U.S. 804, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986) ("[P]etitioner contends that the case represents a straightforward application of the statement in *Franchise Tax Board* that federal-question jurisdiction is appropriate when 'it appears that some substantial, disputed question of federal law is a necessary element of one of the well-pleaded state claims.' 463 U.S. at 13, 103 S.Ct. 2841. *Franchise Tax Board,* however, did not purport to disturb the long-settled understanding that the mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction." (parallel citation omitted)).

the Act, and (2) whether the effect of the Act's safety provision, 49 U.S.C. § 44902(b), on Alshrafi's state claims warrants the removal of this case to federal court.

### 1. Complete Preemption

 In most cases, federal preemption is considered a defense. *Rivet*, 522 U.S. at 476, 118 S.Ct. 921. The Supreme Court has held, however, that "[o]nce an area of state law has been *completely pre-empted,* any claim purportedly based on that pre-empted state-law claim is considered, from its inception, a federal claim, and therefore arises under federal law." *Caterpillar Inc. v. Williams,* 482 U.S. 386, 393, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987) (emphasis added). To hold state law completely

preempted, a court must conclude "that Congress intended federal law to occupy the whole of a regulatory field; that federal judicial power properly extends to actions originally filed in state courts to the extent that they touch upon that field; and that the exercise of such federal power does not offend principles of federalism." *BIW Deceived v. Local S6, Indus. Union of Marine & Shipbuilding Workers,* 132 F.3d 824, 833–34 (1st Cir.1997).[6]

The issue of federal preemption[7] under the Airline Deregulation Act has been extensively briefed by the parties in their summary judgement memoranda. American Airlines contends that Alshrafi's state discrimination and tort claims are preempted because the Act explicitly pre-

---

**6.** *See also* 14B Wright, Miller & Cooper, *supra,* § 3722.1 ("In complete preemption a federal court finds that Congress desired to control the adjudication of the federal cause of action to such an extent that it did not just provide a federal defense to the application of state law; rather, it replaced state law with federal law and made it clear that the defendant has the ability to seek adjudication of the federal claim in a federal forum.").

**7.** The sweeping nature of recent Supreme Court preemption jurisprudence has been the subject of considerable comment, much of it critical. *See, e.g., Andrews–Clarke v. Travelers Ins. Co.,* 984 F.Supp. 49, 53 & n. 20 (D.Mass. 1997) (noting with frustration that under ERISA preemption jurisprudence, it "had no choice but to pluck [the plaintiff's] case out of the state court in which she sought redress (and where relief to other litigants is available) and then, at the behest of [the defendants], to slam the courthouse doors in her face and leave her without any remedy"); Betsy J. Grey, *Make Congress Speak Clearly: Federal Preemption of State Tort Remedies,* 77 B.U. L.Rev. 559, 561 (1997) (commenting that "corporations have attempted to turn [federal statutes] from regulatory swords into private shields"); Calvin Massey, *"Joltin' Joe Has Left And Gone Away": The Vanishing Presumption against Preemption,* 66 Alb. L.Rev. 759, 759 (2003) (commenting that the Supreme Court's

preemption jurisprudence has reduced the "presumption against preemption" into merely a "ceremonial federalism"); Caleb Nelson, *Preemption,* 86 Va. L.Rev. 225, 229 (2000) (noting that "conservative advocates of federalism and liberal advocates of government regulation have joined in arguing that the current tests for preemption risk displacing too much state law"); David G. Owen, *Federal Preemption of Products Liability Claims,* 55 S.C. L.Rev. 411, 412 (2003) (observing that "[d]espite the best efforts of courts and commentators to bring order to the chaos, the law on federal preemption has obstinately refused to set anchor in enduring principles" (footnote omitted)); Donald P. Rothschild, *A Proposed "Tonic" with Florida Lime to Celebrate Our New Federalism: How to Deal with the "Headache" of Preemption,* 38 U. Miami L.Rev. 829, 830–31 & n. 3 (1984) (noting that "present preemption doctrines interfere with a state's right to supplement federal regulation in order to afford greater protection for citizens residing within its borders"); *see also* Judith Resnik, *Constricting Remedies: The Rehnquist Judiciary, Congress, and Federal Power,* 78 Ind. L.J. 223, 309 n. 460 (2003) (noting that a majority of the Supreme Court has been willing to override state law in preemption cases). Still, it is bedrock that Supreme Court decisions bind the analysis of this Court, and this Court follows such precedents respectfully and completely.

vents states from "enact[ing] or enforc[ing] any law ... related to a price, route, or service of an air carrier." 49 U.S.C. § 41713(b)(1); Defs.' Summ. J. Mem. at 20–24. Alshrafi argues that his state claims fall outside the intended scope of the Act's preemption clause. Pl.'s Summ. J. Opp'n at 13–17.

The Supreme Court in *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992), explained the congressional intent behind the Act's preemption provision:

> In 1978, ... Congress, determining that "maximum reliance on competitive market forces" would best further "efficiency, innovation, and low prices" as well as "variety [and] quality ... of air transportation services," enacted the Airline Deregulation Act .... To ensure that the States would not undo federal deregulation with regulation of their own, the ADA included a pre-emption provision, prohibiting the States from enforcing any law "relating to rates, routes, or services" of any air carrier.

504 U.S. at 378–79, 112 S.Ct. 2031 (internal citations omitted). *Morales* broadly defined "relating to" in the preemption clause as "having a connection with or reference to, airline 'rates, routes, or services.'" *Id.* at 384, 112 S.Ct. 2031. The *Morales* Court, however, left room for state laws for which the connection was "too tenuous, remote, or peripheral ... to have pre-emptive effect." *American Airlines, Inc. v. Wolens*, 513 U.S. 219, 224, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995) (quoting *Morales*, 504 U.S. at 390, 112 S.Ct. 2031) (internal quotation marks omitted); *see also Morales*, 504 U.S. at 390, 112 S.Ct. 2031 ("[W]e do not ... set out on a road that leads to pre-emption of state laws against gambling and prostitution as applied to airlines. Nor need we address whether state regulation of the nonprice aspects of fair advertising (for example, state laws preventing obscene depictions) would similarly 'relat[e] to' rates; the connection would obviously be far more tenuous."). In holding that Illinois' deceptive advertising guidelines where preempted by the Act, the *Morales* Court concluded: "All in all, the obligations imposed by the guidelines would have a significant impact upon the airlines' ability to market their product, and hence a significant impact upon the fares they charge." *Morales*, 504 U.S. at 390, 112 S.Ct. 2031.

Under the basic framework set out in *Morales* and reaffirmed by the Supreme Court in *Wolens*, 513 U.S. at 224, 115 S.Ct. 817, this Court must determine whether Alshrafi's state claims for discrimination and intentional infliction of emotional distress "relate to" air carrier rates, routes, or services, and, if so, whether their relationship is "too tenuous, remote, or peripheral" to warrant preemption. Although passenger boarding would seem to be within the purview of air carrier "services" under the preemption clause, Alshrafi urges this Court to limit preemption to claims that more directly touch upon the economic aspects of rates, routes, or services.[8] Pl.'s Opp'n at 13–14. The Su-

---

8. Alshrafi observes that almost all of the cases cited by American Airlines involved state laws with an economic impact on rates and services. *See e.g., Wolens*, 513 U.S. at 227–28, 115 S.Ct. 817 (holding that the Act preempted a state consumer fraud claim for retroactive modification of the airline's frequent flyer program); *Morales*, 504 U.S. at 389–90, 112 S.Ct. 2031 (holding that the Act preempted a

state law claim for deceptive fare advertisement); *Statland v. American Airlines, Inc.*, 998 F.2d 539, 541–42 (7th Cir.1993) (holding that the Act preempted a state law claim challenging the airline's practice of withholding ten percent of the federal tax on canceled tickets); *Blackner v. Continental Airlines, Inc.*, 311 N.J.Super. 10, 13–15, 709 A.2d 258 (App. Div.1998) (holding that the Act preempted a

preme Court's pronouncements in *Morales* and *Wolens* do not suggest that courts should make a rigid distinction between state claims that are economic in nature and those that are not. This Court will instead be guided by Congress's intent to promote "maximum reliance on competitive market forces" and by *Morales'* exception for state laws with only a "tenuous" relationship with rates, routes, and services.

Some Justices of the Supreme Court have recognized that the meaning of the term "service" in Section 41713(b)(1) of the Act has divided the Courts of Appeals. In *Northwest Airlines, Inc. v. Duncan*, 531 U.S. 1058, 121 S.Ct. 650, 148 L.Ed.2d 571 (2000) (Mem.), the Supreme Court declined to review a Ninth Circuit case holding that an airline's allowance of smoking on trans-Pacific flights did not relate to a "service" and therefore the plaintiff's personal injury claims resulting from the policy were not preempted under the Act. *See Duncan v. Northwest Airlines, Inc.*, 208 F.3d 1112, 1114–16 (9th Cir.2000). Justice O'Connor, joined by Chief Justice Rehnquist and Justice Thomas, dissented from the denial of certiorari, commenting that the Courts of Appeals "have taken directly conflicting positions on this question of statutory interpretation":

> The Ninth Circuit below, adhering to its decision in *Charas v. TWA*, 160 F.3d 1259 (1998) (en banc), held that the term "service" encompasses " 'the prices, schedules, origins and destinations of the point-to-point transportation of passengers, cargo, or mail,' " but not the " 'provision of in-flight beverages, personal assistance to passengers, the handling of luggage, and similar amenities.' " *Duncan v. Northwest Airlines,*

state law claim challenging the airline's $60 surcharge to replace a lost ticket); *Vail v. Pan Am Corp.*, 260 N.J.Super. 292, 299–300, 616

*Inc.*, 208 F.3d 1112, 1114–1115 (2000) (quoting *Charas, supra*, at 1261). The Third Circuit has expressly agreed with this approach. *Taj Mahal Travel, Inc. v. Delta Airlines Inc.*, 164 F.3d 186, 194 (1998). In contrast, three Courts of Appeals have adopted a much broader definition. *See Hodges v. Delta Airlines, Inc.*, 44 F.3d 334, 336 (5th Cir.1995) (en banc) (defining "service" in terms of the " '[contractual] features of air transportation,' " including " 'ticketing, boarding procedures, provision of food and drink, and baggage handling' "); *Smith v. Comair, Inc.*, 134 F.3d 254, 259 (4th Cir. 1998) ("Undoubtably, boarding procedures are a service rendered by an airline") (citing *Hodges, supra*, at 336); *Travel All Over The World, Inc. v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1433 (7th Cir.1996) (adopting *Hodges* definition). *See also Chukwu v. Board of Directors British Airways*, 889 F.Supp. 12, 13 (D.Mass.1995), *aff'd mem.*, 101 F.3d 106, 1996 WL 662466 (1st Cir.1996) (same).

*Id.* The circuit split described by Justice O'Connor persists to this day; indeed it has become more stark, and the Supreme Court has yet to elaborate on the scope of the Act's preemption provision beyond its previous decisions in *Morales* and *Wolens.*

Although the meaning of "services" under Section 41713(b) is not without controversy, the fact that numerous federal courts have declined to construe the Act to preempt a variety of state tort and discrimination claims arising from airline conduct strongly suggests that these fields have not been completely preempted for purposes of federal question jurisdiction. *See, e.g., Newman v. American Airlines, Inc.*, 176 F.3d 1128, 1130–31 (9th Cir.1999)

A.2d 523 (App.Div.1992) (holding that the Act preempted state law claims challenging a security surcharge added to ticket prices).

(holding that the Act did not preempt a state disability discrimination claim); *Abdu–Brisson v. Delta Airlines,* 128 F.3d 77, 86 (2d Cir.1997) (holding that the Act did not preempt a state age discrimination claim); *Chowdhury v. Northwest Airlines Corp.,* 238 F.Supp.2d 1153, 1155–56 (N.D.Cal.2002) (applying *Charas* and holding that the Act did not preempt a state ethnic discrimination claim).

It is presently unclear whether the First Circuit would adopt *Hodges'* broad definition of air carrier "services" or *Charas'* narrower understanding of the term. Two years before *Charas* was decided, the First Circuit summarily affirmed in an unpublished table decision a district court opinion adopting the *Hodges* definition and holding that the plaintiff's slander and intentional infliction of serious emotional distress claims resulting from a denial of boarding were preempted by Section 41713(b)(1). *Azubuko v. Bd. of Dirs., British Airways,* 101 F.3d 106, 1996 WL 662466 (1st Cir.1996) (unpublished table decision), *aff'g* 889 F.Supp. 12 (D.Mass. 1995) (Lasker, J.). This area of law has undergone significant development in the years since *Azubuko.* Most important, of course, at the time *Azubuko* was decided,

the First Circuit did not have the benefit of the compelling argument outlined by the Ninth Circuit in *Charas* for its position that Congress intended to preempt state economic regulation of the airline industry, not run-of-the-mill tort claims:

> We conclude that when Congress enacted *federal* economic deregulation of the airlines, it intended to insulate the industry from possible *state* economic regulation as well. It intended to encourage the forces of competition. It did not intend to immunize the airlines from liability for personal injuries caused by their tortious conduct. Like "rates" and "routes," Congress used "service" … in the public utility sense—i.e., the provision of air transportation to and from various markets at various times. In that context, "service" does not refer to the pushing of beverage carts, keeping the aisles clear of stumbling blocks, the safe handling and storage of luggage, assistance to passengers in need, or like functions.

*Charas,* 160 F.3d at 1266.

Even though the First Circuit's *Azubuko* opinion is binding on this Court,[9]

---

9. At an absolute minimum, unpublished First Circuit decisions, such as *Azubuko,* represent persuasive authority in the district courts. *See Caron v. United States,* 183 F.Supp.2d 149, 156 n. 7 (D.Mass.2001) (relying on an unpublished opinion's persuasive authority); *Giese v. Pierce Chem. Co.,* 43 F.Supp.2d 98, 103 n. 1 (D.Mass.1999) (same).

The Eighth Circuit has gone a step further, holding that unpublished opinions have precedential effect. *Anastasoff v. United States,* 223 F.3d 898, 899–905 (8th Cir.2000), *vacated as moot,* 235 F.3d 1054 (8th Cir.2000) (en banc); *see also* Richard S. Arnold, *Unpublished Opinions: A Comment,* 1 J.App. Prac. & Process 219 (1999). The Eighth Circuit's Local Rule 28A(i) provided that "[u]npublished opinions are not precedent," but that they could be cited for their "persuasive value." *Anastasoff,* 223 F.3d at 899. *Anastasoff* held

this rule unconstitutional, reasoning that the Framers of the Constitution were aware of the doctrine of precedent and intended it to "limit the judicial power delegated to the courts by Article III." *Id.* at 900. "A more alarming doctrine could not be promulgated by any American court," exclaimed the court, "than that it was at liberty to disregard all former rules and decisions, and to decide for itself, without reference to the settled course of antecedent principles." *Id.* at 904.

Refuting *Anastasoff,* the Ninth Circuit upheld its local rule prohibiting the citation of unpublished decisions as constitutional. *Hart v. Massanari,* 266 F.3d 1155 (9th Cir.2001); *see also Symbol Techs., Inc. v. Lemelson Med.,* 277 F.3d 1361, 1366–68 (Fed.Cir.2002) (rejecting *Anastasoff* and adopting *Hart* ). The *Hart* court reasoned that "[r]ules that empower courts of appeals to issue nonprecedential

though perhaps not on subsequent panels of the First Circuit,[10] its decision to affirm suggests only that the Act partially preempts state tort law. Recent district court rulings within the First Circuit have held that the Act does not completely preempt state tort law for purposes of federal question jurisdiction. *See Skydive Factory, Inc. v. Maine Aviation Corp.*, 268 F.Supp.2d 61, 62, 64 (D.Me.2003) (holding that the Act did not completely preempt state contract and negligence claims); *Kingsley v. Lania*, 221 F.Supp.2d 93, 97–98 (D.Mass.2002) (Dein, M.J.) (holding that the Act did not completely preempt state contract and tort claims); *see also Stone v. Frontier Airlines, Inc.*, 256 F.Supp.2d 28, 40–43 (D.Mass.2002) (holding that the Act did not completely preempt a passenger's wrongful death claim); *Somes v. United Airlines*, 33 F.Supp.2d 78, 85–87 (D.Mass.

1999) (Lasker, J.) (same). As these courts have, this Court concludes that *Azubuko* does not preclude it from examining the Act's application to Alshrafi's particular state claims before concluding whether complete preemption warrants removal of this case to federal court.

With regard to Alshrafi's claims of discrimination and intentional infliction of emotional distress, the parties' memoranda highlight two instructive preemption cases. American Airlines argues that this Court should look to *Huggar v. Northwest Airlines, Inc.*, No. 98 C 594, 1999 WL 59841 (N.D.Ill. Jan.27, 1999), a case holding that the Act preempted a passenger's claims of intentional infliction of emotional distress and entering summary judgment for the airline on the passenger's race discrimination claim under the Illinois Human Rights

decisions do not cut those courts free from all legal rules and precedents," but instead "allow panels of the courts of appeals to determine whether future panels, as well as judges of the inferior courts of the circuit, will be bound by particular rulings." *Id.* at 1160. The court emphasized that "[t]he concept of binding case precedent, though it was known at common law, was used exceedingly sparingly" at the time Article III of the Constitution was drafted. *Id.* at 1175 (internal citation omitted). Overall, *Hart* conceives of "the principle of strict binding authority" as "a matter of judicial policy," rather than a constitutional issue. *Id.*

Local rules cabining litigants' ability to cite unpublished opinions have come under attack recently by the Advisory Committee on Appellate Rules of the United States Judicial Conference. Amid much opposition, the Committee voted 7–2 in favor of proposed Federal Rule of Appellate Practice 32.1, stating that "no prohibition or restriction may be imposed" on the citation of unpublished decisions. *See* Tony Mauro, *Unpublished Opinions Get a First Nod*, Nat'l L.J., Apr. 19, 2004, at 6. The Committee has left it up to the Courts of Appeals to decide how much weight they will give to unpublished opinions. *Id.* Thus, the proposed rule does nothing to prevent courts of appeals from refusing to

give precedential effect to unpublished decisions. Even if the proposal is approved by the full United States Judicial Conference and the Supreme Court, the constitutional debate between *Anastasoff* and *Hart* will continue unabated. *See* Gary Young, *Cite, Publish or Perish?*, Nat'l L.J., May 3, 2004, at S1.

Because this Court considers the reasoning of *Anastasoff* especially compelling, it will treat the First Circuit's holding in *Azubuko* with great care and respect. Notwithstanding this position, the Court observes that *Azubuko* easily can be distinguished from the instant case for the reasons set forth in this opinion.

10. First Circuit Local Rule 32.3(a)(2) provides:

> Citation of an unpublished opinion of this court is disfavored. Such an opinion may be cited only if (1) the party believed that the opinion persuasively addresses a material issue in the appeal; and (2) there is no published opinion from this court that adequately addresses the issue. The court will consider such opinions for their persuasive value but not as binding precedent.

This Court notes with some concern, however, that the constitutionality of this local rule is suspect under the reasoning of *Anastasoff*.

Act. *Id.* at *6, *9. Huggar, an African American, alleged that he was removed from a Northwest Airlines flight on the basis of his race. *Id.* at *1. Northwest Airlines maintained in their defense that Huggar was removed for purely safety reasons after he and a flight attendant were involved in a verbal altercation. *Id.* at *2. In concluding that Huggar's "claims 'relate to' the airline's provision of services" and were therefore preempted by the Act, the court reasoned that "Huggar's claims expressly refer to Northwest Airlines' service of transportation" and "are based on Northwest Airlines' decision to remove Huggar from the aircraft for safety reasons rather than transport him to Minneapolis on that flight." *Id.* at *9.

Alshrafi urges the Court instead to follow *Doricent v. American Airlines, Inc.*, Civ. A. No. 91–12084Y, 1993 WL 437670 (D.Mass. Oct.19, 1993), a case in which this Court held that the Act did not preempt a passenger's claims of intentional infliction of emotional distress and race discrimination under Mass. Gen. Laws ch. 93, § 102. *Id.* at *5–7. Doricent alleged that prior to his flight's departure from Haiti, American Airlines employees referred to him using racial epithets, threatened to remove him from the plane, and physically assaulted him. *Id.* at *1–2. American Airlines denied that the incident ever took place. *Id.* at *1. This Court held that American Airlines' alleged actions did not "relate to" services under the Supreme Court's decision in *Morales:*

> While the context of American's actions here may ... arguably constitute "services"—poor services, to be sure—... the *Morales* decision does not compel a conclusion that the state claims of inten-

tional torts made by Doricent here "relate to" services as the *Morales* court analyzed the term. Racial discrimination, the intentional infliction of emotional distress, and assault and battery have nothing whatsoever to do with any legitimate or quasi-legitimate industry-wide practice of affording airline service. Imposing liability for such conduct under Massachusetts law is not shown to in any way "significantly impact" an airline's ability to administer services, or set rates and routes. In addition, this Court has no evidence before it that recognition of Doricent's claims will frustrate in any way the purpose of the Airline Deregulation Act to promote "competitive market forces."

*Id.* at *5.

American Airlines tries to distinguish *Doricent* from this case by arguing that *Doricent* involved more extreme allegations of discrimination and did not present this Court with issues of safety and security. Defs.' Summ. J. Reply at 12. Alshrafi attempts to minimize *Huggar* by summarily tagging it as an "unpersuasive outlier." Pl.'s Summ. J. Opp'n at 16. Neither argument is terribly compelling.

■ This Court concludes that the reasoning in *Doricent* easily can extend to cases that present issues of safety and security such as this one. The question in such cases is whether claims brought for racial and religious discrimination and the intentional infliction of emotional distress caused by such discrimination are preempted by an air carrier's right to "refuse to transport a passenger or property the carrier decides is, or might be, inimical to safety."[11] 49 U.S.C. § 44902(b).

---

11. In its reply brief, American Airlines points to two cases where courts have held a state's safety regulation preempted by the Act. Defs.' Summ. J. Reply at 9–10 (citing *French v. Pan*

*Am Express, Inc.*, 869 F.2d 1, 1 (1st Cir.1989), which held that the Act preempted state law providing for drug testing of pilots, and *Huntleigh Corp. v. Louisiana State Board of Private*

American Airlines has not suggested, and this Court cannot imagine, that racial and religious prejudice and the intentional infliction of emotional distress [12] bear any relation to the legitimate preservation of airline security. Although Section 44902 certainly extends broad discretion to air carriers to make safety decisions, the statute does not grant them a license to discriminate. *See Bayaa v. United Airlines, Inc.*, 249 F.Supp.2d 1198, 1205 (C.D.Cal. 2002). Nor does it permit air carriers to exercise their discretion arbitrarily or capriciously. Indeed, actions motivated by racial or religious animus are necessarily arbitrary and capricious, and therefore beyond the scope of the discretion granted by Section 44902. *See Dasrath v. Continental Airlines, Inc.*, 228 F.Supp.2d 531, 540 n. 12 (D.N.J.2002). Fundamentally, it is beyond dispute that Congress cannot enact any law that would effectuate, directly or indirectly, the private racial and religious biases of airline employees. *See Palmore v. Sidoti*, 466 U.S. 429, 432–33, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984) ("Classifying persons according to their race is more likely to reflect racial prejudice than legitimate public concerns; the race, not the person, dictates the category.... Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect."). Therefore, the possible application of Section 44902 to this case does nothing to bolster American Airlines' argument that Alshrafi's state claims are preempted by the Act and thus subject to removal.

■ Moreover, although the allegations set forth in *Doricent* were arguably more extreme than those in this case, it still holds true that "[r]acial discrimination [and] intentional infliction of emotional distress ... have nothing whatsoever to do with any legitimate or quasi-legitimate industry-wide practice of affording airline service" under the Act's express preemption provision. *Doricent*, 1993 WL 437670, at *5. At most, Massachusetts' discrimination and intentional tort laws have a "tenuous, remote, or peripheral" effect on airline services, and Section 41713(b) thus has no "pre-emptive effect." *Wolens*, 513 U.S. at 224, 115 S.Ct. 817 (quoting *Morales*, 504 U.S. at 390, 112 S.Ct. 2031) (internal quotation marks omitted). Furthermore, American Airlines has not provided this Court with any evidence that Alshrafi's state claims would impair the Act's purpose to promote "maximum reliance on competitive market forces." *See Morales*, 504 U.S. at 378–79, 112 S.Ct. 2031. This

*Security Examiners*, 906 F.Supp. 357, 361 (M.D.La.1995), which held that the Act preempted state laws governing the registration and training of private security officers performing airport screenings). This is not, however, a case where Massachusetts has prescribed airline safety provisions that compete with or conflict with the Act. Section 44902 simply states that an "air carrier ... may refuse to transport a passenger or property the carrier decides is, or might be, inimical to safety." 49 U.S.C. § 44902(b). It does not state that an air carrier may use "safety" as a pretext to refuse transport to a passenger on the basis of his race or intentionally to inflict emotional distress upon a passenger. Thus, *French* and *Huntleigh* do not apply to this case.

**12.** To prove intentional infliction of emotional distress under Massachusetts law, Alshrafi must prove, among other elements, that American Airlines' "conduct was extreme and outrageous, was beyond all possible bounds of decency and was utterly intolerable in a civilized community." *Agis v. Howard Johnson Co.*, 371 Mass. 140, 145, 355 N.E.2d 315 (1976) (internal citations and quotation marks omitted); *see also Sena v. Massachusetts*, 417 Mass. 250, 263–64, 629 N.E.2d 986 (1994). Even under the most lenient of standards, this Court seriously doubts that such outrageous, intolerable conduct could constitute a legitimate airline security measure.

Court therefore holds that Alshrafi's state claims for discrimination under Mass. Gen. Laws ch. 272, §§ 92A, 98 (Count I) and intentional infliction of emotional distress (Count II) are not completely preempted by the Airline Deregulation Act, and thus cannot be removed to federal court on this basis.

*Huggar v. Northwest Airlines* does not contradict this result. In its preemption analysis, the *Huggar* court assumed that the airline's decision to deny boarding to Huggar was on the legitimate basis of security, not race. The court explained that Huggar's claims "relate[d] to" services within the meaning of the preemption clause because they were "based on Northwest Airlines' decision to remove Huggar from the aircraft *for safety reasons.*" *Huggar*, 1999 WL 59841, at *9 (emphasis added). The court framed Huggar's claim in such a way because it held earlier in its opinion that (1) "[e]xamination of Huggar's answer to Northwest Airline's motion for summary judgment reveals that [Huggar's allegations that race was the real reason he was escorted from the plane] are merely conclusory statements unsupported by the record"; and (2) "[t]he record clearly shows that Huggar's threatening words and actions warranted his removal from that Northwest Airlines flight, not only for the crew[']s safety but for the safety of the other passengers." *Id.* at *6. Thus, although the court lists Huggar's state race discrimination count among the "Tort Claims" preempted by the Act, the court's preemption analysis really only deals with ordinary tort claims; the court disposed of the race discrimination claim by finding that no genuine issue of material fact existed and that the airline was "entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *see Huggar*, 1999 WL 59841, at *6, *9–10.

In contrast to *Huggar*, it is still disputed in this case whether Alshrafi was denied boarding for legitimate security reasons or whether security was merely a pretext for discrimination on the basis of national origin, race, or religion. Therefore, *Huggar* does not conflict with this Court's holding that Alshrafi's state claims are not completely preempted by the Act for purposes of federal question jurisdiction.

### 2. Federal Ingredient Jurisdiction

■ Although the history of federal ingredient jurisdiction has been marked by some controversy, the doctrine "remains vibrant" in the First Circuit. *Metheny*, 352 F.3d at 460. As the First Circuit elaborated in *Almond*, the doctrine survives but should be applied sparingly:

> A more controversial basis for "arising under" jurisdiction under section 1331 exists where, regardless of whether federal or state law creates the claim, a well-pleaded complaint necessarily "requires resolution of a substantial question of federal law." *Franchise Tax Bd.*, 463 U.S. at 13, 103 S.Ct. 2841. The Supreme Court has periodically affirmed the basis for jurisdiction in the abstract (*Smith v. Kansas City Title & Trust Co.*, 255 U.S. 180, 41 S.Ct. 243, 65 L.Ed. 577 (1921), is the most famous example), occasionally cast doubt upon it, rarely applied it in practice, and left the very scope of the concept unclear. Perhaps the best one can say is that this basis endures in principle but should be applied with caution and various qualifications.

*Id.* at 23 (parallel citations and footnote omitted). The Supreme Court has allowed federal ingredient jurisdiction in cases presenting important constitutional issues, *see Smith*, 255 U.S. at 180, 41 S.Ct. 243; *City of Chicago v. International College of Surgeons*, 522 U.S. 156, 118 S.Ct. 523, 139

L.Ed.2d 525 (1997), but has denied federal ingredient jurisdiction in cases where state tort claims merely incorporated federal fault standards, *see Merrell Dow,* 478 U.S. at 804, 106 S.Ct. 3229; *Moore v. Chesapeake & Ohio R. Co.,* 291 U.S. 205, 54 S.Ct. 402, 78 L.Ed. 755 (1934).

American Airlines cites only one case, *Schaeffer v. Cavallero,* 29 F.Supp.2d 184 (S.D.N.Y.1998), in support of its argument that resolution of Alshrafi's state claims necessarily requires this Court to resolve the question whether Blackstone's actions were "arbitrary and capricious" under Section 44902(b). Defs.' Jdn. Mem. at 2. In *Schaeffer,* the defendant pilot expelled the plaintiff from a flight following a dispute over his carry-on luggage. *Schaeffer,* 29 F.Supp.2d at 185. The plaintiff filed suit in state court, asserting contract and tort claims, and the defendants removed the case to federal court, contending that the plaintiff's right to relief was governed by section 44902(b)'s provision that an airline "may refuse to transport a passenger or property the carrier decides is or might be inimical to safety." *Id.* (quoting 49 U.S.C. § 44902(b)). The court held that removal was proper because "the federal standard set by § 44902, as authoritatively interpreted by the federal courts [in the Second Circuit], has become an essential element of any New York state law claim arising from an airline's refusal to transport a passenger." *Id.* at 186 (citing *Williams v. Trans World Airlines,* 509 F.2d 942, 948 (2d Cir.1975), which held, under the predecessor to Section 44902, that an air carrier cannot be liable for refusing to transport a passenger if the decision was "rational or reasonable and not capricious or arbitrary," and *Adamsons v. American Airlines,* 58 N.Y.2d 42, 48, 457 N.Y.S.2d 771, 444 N.E.2d 21 (N.Y.1982), which held that a New York state claim for wrongful exclusion from an air carrier cannot be submitted to a jury absent an "arbitrary and capricious" showing).

This Court is not persuaded by *Schaeffer.* American Airlines has not cited, and this Court's research has not revealed, any case in the First Circuit or in the courts of the Commonwealth of Massachusetts that has even approached making the sweeping statement that the "arbitrary and capricious" standard applied to decisions made pursuant to Section 44902(b) has become an essential element of any Massachusetts claim arising from an airline's denial of a passenger's boarding.[13] Furthermore, American Airlines has not sufficiently demonstrated to this Court that Alshrafi's claims even *"require* [ ] resolution of a *substantial* question of federal law." *Franchise Tax Board,* 463 U.S. at 13, 103 S.Ct. 2841 (emphasis added). Certainly it is foreseeable that, upon remand, the state court may eventually have to apply the "arbitrary and capricious" standard to American Airlines' decision to deny boarding to Alshrafi. If, however, Alshrafi could prove by a preponderance of the evidence that he was denied boarding on the basis of his national origin, race, or religion, then American Airlines could not avail themselves of the discretion extended to them under Section 44902(b) and no review under the "arbitrary and capricious" standard would be required. Similarly, if Alshrafi could prove all the elements of intentional infliction of emotional distress under Massachusetts law, including that American Airlines' actions were

---

**13.** Even if Massachusetts had incorporated the federal standard of Section 44902 as an essential element of state claims arising out of passenger boarding, this case would likely be more akin to *Merrell Dow* and *Moore* (both denying federal jurisdiction where a state claim incorporated a federal fault standard) than to *Smith* and *City of Chicago* (both allowing federal jurisdiction where a state claim raised important constitutional issues).

"extreme and outrageous," "beyond all possible bounds of decency," and "utterly intolerable in a civilized community," *Sena v. Massachusetts*, 417 Mass. 250, 263–64, 629 N.E.2d 986 (1994) (internal citations omitted), then it would appear that American Airlines acted beyond the scope of their discretion under Section 44902(b). Overall, even if Alshrafi's claims raise federal issues somewhere down the road, this Court cannot, at this juncture, rule those federal issues sufficiently important to confer federal ingredient jurisdiction on this Court.

## IV. CONCLUSION

Accordingly, this case is REMANDED to the Massachusetts Superior Court sitting in and for the County of Suffolk for lack of federal subject matter jurisdiction.

SO ORDERED.